1  CAROL CLAYTON
   CATHERINE C. COLLINS
2  KEVIN DINAN
   MARK KOEHN
3  JOHN R. MATSON III
   Office of Enforcement
4  Federal Energy Regulatory Commission
   888 1st Street, N.E.
5  Washington, D.C. 20426
   Telephone: 202-502-8100
6  Carol.Clayton@ferc.gov
   Catherine.Collins@ferc.gov
7  Kevin.Dinan@ferc.gov
   Mark.Koehn@ferc.gov
8  Jay.Matson@ferc.gov

9  Attorneys for Plaintiff

10

11            **IN THE UNITED STATES DISTRICT COURT**
              **FOR THE EASTERN DISTRICT OF CALIFORNIA**

12

13  **FEDERAL ENERGY REGULATORY**        CASE NO.
    **COMMISSION,**
14
              **Plaintiff,**
15
         **v.**                          **COMPLAINT**
16
    **VITOL INC. AND FEDERICO**
17  **CORTEGGIANO,**

18            **Defendants.**

19

20

21         Plaintiff Federal Energy Regulatory Commission (FERC or Commission), by and through

22  counsel, brings this action pursuant to Section 31(d) of the Federal Power Act (FPA), 16 U.S.C.

23  § 823b(d) (2018), for an order affirming and enforcing the Commission's October 25, 2019 Order

24  Assessing Civil Penalties against Defendants Vitol Inc. (VIC) and Federico Corteggiano

25  (Corteggiano), a financial energy products trader employed at VIC.  *Vitol Inc. and Federico*

26  *Corteggiano*, 169 FERC ¶ 61,070 (2019) (Penalty Order).  The Commission's Penalty Order is

27  attached as Exhibit 1 and incorporated in this Complaint by reference.

28

    Complaint                                1

**SUMMARY OF THE ACTION**

1.      This matter involves judicial review of civil penalties and disgorgement assessed by the Commission against VIC and civil penalties assessed against Corteggiano for engaging in an unlawful, fraudulent, cross-product manipulation scheme in the California Independent System Operator's (CAISO) wholesale electric power market in October and November 2013.

2.      Following an extensive investigation by the Commission's Office of Enforcement (Enforcement) and an adjudicative show cause proceeding before the Commission, the Commission found that Defendants violated FPA Section 222(a), 16 U.S.C. § 824v(a), and the Commission's Anti-Manipulation Rule, 18 C.F.R. § 1c.2 (2019), by selling physical power at a loss at the Cragview pricing node in CAISO's wholesale electric market to manipulate wholesale power prices and thereby economically benefit certain of VIC's Congestion Revenue Rights (CRRs), financial instruments whose value depended on the prices at Cragview. Corteggiano was the architect of this scheme.  The Commission ordered VIC to pay a civil penalty of $1,515,738 and disgorge unjust profits of $1,227,143, plus applicable interest.   The Commission also ordered Corteggiano to pay a $1,000,000 civil penalty.

3.      Prior to the issuance of the Penalty Order, Defendants elected the procedures of FPA Section 31(d)(3)(A), 16 U.S.C. § 823b(d)(3)(A), under which the Commission conducts an adjudicative proceeding to determine if a violation occurred and to assess penalties based on its review of the full investigative record and the parties' factual and legal submissions.  Under FPA Section 31(d)(3)(B), 16 U.S.C. § 823b(d)(3)(B), if the Commission finds a violation and assesses penalties, and if those penalties are not paid within 60 days of the Commission's Order, the Commission "shall institute an action in the appropriate district court of the United States for an order affirming the assessment of the civil penalty."  Defendants failed to pay the assessed penalties and disgorgement within 60 days after issuance of the Penalty Order, and the Commission therefore is filing this Complaint seeking affirmance of the Penalty Order.  Under FPA Section 31(d)(3)(B), 16 U.S.C. § 823b(d)(3)(B), this Court "shall have authority to review de novo the law and the facts involved, and shall have jurisdiction to enter a judgment enforcing, modifying, and enforcing as so modified, or setting aside in whole or in [p]art" the Commission's Penalty Order.

1

**PARTIES**

2

    **A.**    **Plaintiff**

3

    4.    Plaintiff Federal Energy Regulatory Commission is an administrative agency of the

4

United States, organized and existing as an independent, bipartisan Commission, pursuant to, *inter*

5

*alia*, the FPA, 16 U.S.C. §§ 791a *et seq.*.   Under the FPA, the Commission is charged with, among

6

other things, ensuring just and reasonable prices of wholesale electricity and regulating and policing

7

the wholesale electricity markets.

8

    **B.**    **Defendants**

9

    5.    Defendant Vitol Inc., a Delaware corporation with its principal place of business in

10

Houston, Texas, is a direct, wholly-owned subsidiary of Vitol Holding SARL.  Vitol Holding SARL

11

is a direct, wholly-owned subsidiary of Vitol Holding BV, a privately held Dutch company engaged

12

in the physical distribution and trading of crude oil and petroleum products, energy, and other

13

commodities. Vitol Holding BV has over 40 offices worldwide and in 2018 had over $231 billion

14

in revenues.  VIC trades oil, power, and other energy-related products throughout the United States.

15

    6.    Defendant Federico Corteggiano is employed at VIC as a trader of purely financial

16

energy-related products.   During the relevant period, Corteggiano traded CRRs in CAISO's

17

wholesale electric market.   Corteggiano holds a Ph.D. in power system engineering and has

18

extensive experience trading financial products in power markets.   Corteggiano resides in Katy,

19

Texas.

20

**JURISDICTION AND VENUE**

21

    7.    This Court has subject matter jurisdiction over this action pursuant to FPA Section

22

31(d)(3)(B), 16 U.S.C. § 823b(d)(3)(B); FPA Section 317, 16 U.S.C. § 825p; and 28 U.S.C.

23

§ 1331.

24

    8.    This Court has personal jurisdiction over each of the Defendants pursuant to Fed.

25

R. Civ. P. 4(k)(1)(C) because FPA Section 317, 16 U.S.C. § 825p, provides for nationwide

26

service of process and therefore satisfies this subdivision of Rule 4, which provides that

27

"[s]erving a summons or filing a waiver of service establishes personal jurisdiction over a

28

defendant . . . when authorized by a federal statute."  Defendants are subject to personal

1    jurisdiction based on their contacts with the United States, including VIC's incorporation in

2    Delaware, maintenance of its principal place of business in Texas, and transaction of business in

3    CAISO's market in California; and Corteggiano's domicile in Texas and transaction of business

4    in CAISO's market in California.

5          9.       Venue properly lies within the Eastern District of California pursuant to FPA

6    Section 317, 16 U.S.C. § 825p, because the acts and transactions constituting the violations

7    occurred in this District.  Defendants engaged in an unlawful scheme to manipulate electricity

8    prices in CAISO's wholesale electric market.  CAISO is headquartered in Folsom, California,

9    located in Sacramento County within this District.  In the CAISO market, transactions are

10   processed through CAISO's servers located in Folsom.  Defendants sold physical power at the

11   Cragview node that was imported into CAISO over the Cascade intertie.  The Cragview node and

12   the Cascade intertie are located in Siskyou and Shasta Counties, which are also within this

13   District.  Defendants' unlawful scheme caused harm to CAISO and to electricity consumers and

14   others located or doing business in this District.

15                         **FACTUAL BACKGROUND**

16       **A.       The Commission's Anti-Manipulation Authority**

17         10.       The Commission's core statutory mission under the FPA is to ensure that the

18   wholesale prices for the transmission and sale of electric energy in interstate commerce are just

19   and reasonable.  *See* FPA Sections 201, 205, 16 U.S.C. §§ 824, 824d.  In the wake of the Western

20   Energy Crisis of 2000-2001 and the resulting unjust and unreasonable rates caused by Enron

21   Corporation's manipulative schemes, Congress, through the Energy Policy Act of 2005, Pub. L.

22   109-58 (EPAct 2005), amended the FPA to give the Commission two new enforcement tools.

23   First, EPAct 2005 gave the Commission the authority to assess civil penalties of up to $1 million

24   per day, per violation, against any person who violates Part II of the FPA or any rule or order

25   thereunder.  FPA Section 316A(b), 16 U.S.C. § 825o-1(b); *see* FPA Section 3(4), 16 U.S.C. §

26   796(4) (defining "person" to include an individual or corporation).  Second, EPAct 2005 provided

27   additional authority to prohibit market manipulation in Part II of the FPA.  In relevant part, FPA

28   Section 222, 16 U.S.C. § 824v(a), makes it:

Complaint                        4

1
2
3
4
5

> [U]nlawful for any entity . . . directly or indirectly, to use or
> employ, in connection with the purchase or sale of electric energy .
> . . any manipulative or deceptive device or contrivance (as those
> terms are used in section 10(b) of the Securities Exchange Act of
> 1934 (15 U.S.C 78j(b))), in contravention of such rules and
> regulations as the Commission may prescribe as necessary or
> appropriate in the public interest or for the protection of electric
> ratepayers.

6
7
8
9
10
11
12
13

11.    After EPAct 2005 became law, the Commission promulgated the Anti-Manipulation Rule, 18 C.F.R. § 1c.2, which prohibits an entity from: (1) using a fraudulent device, scheme, or artifice, or making a material misrepresentation or a material omission as to which there is a duty to speak under a Commission-filed tariff, Commission order, rule, or regulation, or engaging in any act, practice, or course of business that operates or would operate as a fraud or deceit upon any entity; (2) with the requisite scienter; (3) in connection with the purchase or sale of electricity subject to the jurisdiction of the Commission.  18 C.F.R § 1c.2; *Prohibition of Energy Market Manipulation, Order No. 670*, FERC Stats. & Regs. ¶ 31,202 at P 49 (2006) (Order No. 670).

14
15
16
17

12.    In Order No. 670, the Commission stated that it "defines fraud generally, that is, to include any action, transaction, or conspiracy for the purpose of impairing, obstructing or defeating a well-functioning market.  Fraud is a question of fact that is to be determined by all the circumstances of a case."  *Id*. P 50.

18
19
20
21
22
23
24

13.    The Commission determined in Order No. 670 that the term "any entity" includes natural persons.  *Id.* P 18.  All of the courts that have considered the issue agreed with the Commission.  *See FERC v. Coaltrain Energy, L.P.*, *et al.,* No. 2:16-cv-732, 2018 WL 7892222, at *9-10 (S.D. Ohio 2018); *FERC v. City Power Marketing, LLC, et al.*, 199 F. Supp. 3d 218, 239 (D.D.C. 2016); *FERC v. Maxim Power Corp.*, 196 F. Supp. 3d 181, 201 (D. Mass. 2016); *FERC v. Silkman*, 177 F. Supp. 3d 683, 710 (D. Mass. 2016); *FERC v. Barclays Bank PLC*, 105 F. Supp. 3d 1121, 1145-46 (E.D. Cal. 2015).

25
26
27
28

14.    The Commission has consistently found that cross-product manipulation violates Section 222 of the FPA and the Commission's Anti-Manipulation Rule.  In a cross-product manipulation scheme, an entity trades in one product with the intent to move prices in a particular direction to benefit a related product that it owns.  *See, e.g., ETRACOM LLC and Michael*

*Rosenberg*, 155 FERC ¶ 61,284, at PP 41 and 57 (2016); *BP America Inc.,* 156 FERC ¶ 61,031, at P 46 (2016); *Barclays Bank PLC*, 144 FERC ¶ 61,041, at PP 16 and 129 (2013); *Deutsche Bank Energy Trading, LLC,* 142 FERC ¶ 61,056, at P 18 (2013); *Constellation Energy Commodities Group, Inc.*, 138 FERC ¶ 61,168, at PP 11-17 (2012); *Energy Transfer Partners, L.P.*, *et al.*, 120 FERC ¶ 61,086, at PP 5-13 (2007).

**B.     CAISO's Market**

15.     CAISO is an independent system operator that is subject to FERC's regulation under the FPA.  The Commission has exclusive jurisdiction over the terms and conditions of, and rates for, wholesale electric service, pursuant to which it approves tariffs of general applicability filed by CAISO and other independent system operators.  CAISO operates the wholesale electricity market for most of California under its Commission-approved tariff.

16.     Trading locations wholly within CAISO's control area are called "nodes" and trading locations at its borders with areas controlled by other entities are called "interties."  At an intertie, power moving out of CAISO is considered an export; power moving into CAISO is considered an import.

17.     Because of the unique characteristics of electricity, including inelastic demand and lack of effective storage, at any given moment suppliers in CAISO must generate the exact amount of power necessary to meet the demand of utilities that buy power from CAISO for resale to end users.  CAISO uses day-ahead markets and real-time markets to balance supply and demand and set wholesale prices for electricity.  Based on forecasts of available supply and demand, CAISO schedules generators on an hourly basis in the day-ahead market (the day before power actually flows to consumers).  On the operating day, in the real-time market, CAISO adjusts those schedules to reconcile any differences between the schedules in the day-ahead market and what is actually needed to serve demand in real time.

18.     CAISO markets use locational marginal prices (LMPs) for settlements of wholesale electric purchases and sales at the nodes and interties.  CAISO's market software calculates LMPs for each node and intertie for each hour in the day-ahead market.  The software applies algorithms contained in CAISO's Commission-approved tariff that account for supply and demand bids,

physical and operational limits on transmission facilities, and other factors relating to system efficiency and reliability.  All market participants whose bids to purchase or supply power are accepted by CAISO will pay or receive the same LMP, rather than the prices they bid, for reasons of economic efficiency.

19.     All LMPs have three components: (1) the system marginal cost of energy, which is the energy commodity price; (2) the marginal cost of congestion, which generally reflects the added cost of meeting demand at a location that, due to physical or operational constraints on the transmission system, cannot be met by dispatching power from lower-cost generators located outside the constrained area; and (3) the marginal loss cost, which is the cost of electric power lost as it turns into heat while traveling over the transmission system.  Although the system marginal cost of energy is the same at all locations at any particular time, the marginal costs of congestion and transmission losses vary by location.  The marginal loss cost is typically very small and most of the difference in the LMPs between nodes is attributable to the marginal cost of congestion.

20.     During the period of Defendants' manipulative trading, bids for supply or purchase of energy in CAISO's day-ahead market had to be submitted by 10:00 a.m. Pacific time on the day before delivery.  About three hours later, at approximately 1:00 p.m. Pacific time, CAISO informed bidders whether it had accepted (or "cleared") their bids for the day-ahead market.  At the same time, CAISO also published the hourly LMP for each node and intertie, including the value (in dollars per megawatt hour (MWh)) of each of the three components making up the LMP (energy, congestion, and losses).  At approximately the same time, CAISO published "net flow" data for the interties, reflecting the net volume of exports and imports, measured in megawatts (MW) at each intertie.

21.     CRRs are a financial product in CAISO's market that allow market participants to manage their exposure to congestion costs in the day-ahead market.  Market participants may also purchase CRRs as a speculative investment.  CRRs can be acquired via annual and monthly auctions and parties can purchase and sell them in a secondary market.  CRRs have a designated quantity, stated in MW, and a term (monthly, quarterly, or longer term).  CRRs are differentiated by two time of use periods: "on-peak" and "off-peak."  On-peak hours are generally daytime and

Complaint                                          7

early-evening hours Monday through Saturday while off-peak hours are generally nighttime hours and all hours on Sunday.  Each CRR consists of a "source" node and a "sink" node, which designate the direction of the CRR (with the CRR direction running from source to sink).

22.    CRRs settle on an hourly basis in the day-ahead market based on the difference in the day-ahead marginal congestion cost between the source and sink nodes for each hour.  The CRR holder receives a payment if congestion occurs between the nodes in the same direction as the CRR. Conversely, the holder incurs a charge if congestion occurs in the opposite direction of the CRR. A market participant purchasing a CRR speculates that congestion will occur on that path from the source node to the sink node.  The higher the congestion costs, the higher the payment or charge.

23.    CRR settlements are paid through CAISO's CRR Balancing Account, which is funded by a combination of day-ahead market congestion revenues and proceeds from the CRR auctions.  Any revenue shortfall in this account, which may occur if the payments owed to CRR holders based on their entitlements exceed the market revenue generated by congestion costs, is funded through an allocation of the shortfall to load-serving entities, such as electric utilities that serve homeowners and other retail customers.

24.    During the relevant time period, CRRs could be purchased with the Cragview node as the source or sink.  The Cragview node is the scheduling and pricing point for power transfers over the Cascade intertie, which in CAISO's model of its transmission network is an interface between CAISO and the PacifiCorp-West control area.  The Cragview node is associated with the Cragview electrical bus, which is a physical location on the transmission system in PacifiCorp-West's control area.   The Cragview bus is connected to CAISO through a single, 115 kV transmission line, which is commonly referred to as the Cascade intertie.  The Cascade intertie is very small, with only approximately 80 MW of import capacity and approximately 45 MW of export capacity.  The LMPs at the Cragview node reflect one hundred percent of the congestion on the Cascade intertie.

C.    **Susceptibility of Partially Derated Interties to Manipulation**

25.    Interties have export and import ratings, stated in MW, that set the maximum amount of power that can be transmitted over the intertie in each of the export and import directions

Complaint                                           8

during normal operating conditions.  CAISO may lower a rating temporarily to limit power flows for various physical or operational reasons.  This is called a "derate."  CAISO may derate an intertie to 0 MW in only one direction (known as a "partial derate"), in which case it will still accept both import and export bids because it can manage exports and imports so they net to 0 MW in the derated direction.

26.    In early 2010, CAISO published information concerning the risk of price manipulation at partially derated CAISO interties, particularly focusing on CRR holders that could manipulate the congestion cost component of LMPs for the benefit of their CRRs.  On March 19, 2010, CAISO's Market Surveillance Committee held a public meeting to discuss the manipulation risk.  CAISO's Department of Market Monitoring (DMM) and a representative of Southern California Edison Company (SCE) gave presentations at the meeting that CAISO published on its website.   The DMM's presentation explained that the LMP at a partially derated intertie could be set by an uncleared bid and that the LMP could therefore include congestion costs even when no import or export bids cleared.   The DMM's presentation stated that intertie prices are sensitive to the lack of competition (*i.e.*, to the lack of "liquidity" or market activity) and that there are generally lower bid volumes at partially derated interties.  SCE's presentation showed that, at a partially derated intertie, an accepted bid as low as 1 MW in the opposite direction of the derate could alter or eliminate the congestion costs in the LMP.  SCE's presentation warned that CRR holders could manipulate LMPs at a partially derated intertie simply by flowing more power (*i.e.*, selling physical power for import or export) in the opposite direction of the derate than flows in the direction of the derate.

27.    The CAISO DMM's presentation at the March 19, 2010, Market Surveillance Committee was based on the facts in Enforcement's investigation of alleged cross-product manipulation at the Silver Peak intertie in early 2010 by two employees of Deutsche Bank Energy Trading (Deutsche Bank).  One of those employees was Defendant Corteggiano, who worked as the head of financial energy products trading at Deutsche Bank before he joined VIC.  Corteggiano admitted to Enforcement in sworn testimony in 2010 that he made physical trades in the opposite direction of the derates at the Silver Peak intertie to benefit the CRRs he purchased on Deutsche

Bank's behalf. This conduct ultimately resulted in manipulation claims by Enforcement against Deutsche Bank that Deutsche Bank later settled with a payment of a civil penalty and disgorgement. *Deutsche Bank Energy Trading, LLC,* 142 FERC ¶ 61,056 (2013). The trading at Silver Peak was the only time in Corteggiano's career that he traded physical power until he undertook the manipulative scheme at issue in this case.

### D. Enforcement's Investigation

28. On December 16, 2013, a market participant in the CAISO market met with Enforcement on a confidential basis to report its concern that VIC had engaged in cross-product market manipulation during the week of October 28 through November 1, 2013, by importing power over the partially derated Cascade intertie to benefit VIC's CRRs sourced at Cragview. On February 5, 2014, Enforcement opened an investigation of VIC's import transactions. Enforcement conducted a thorough investigation of VIC's and Corteggiano's conduct, which included issuing document subpoenas and data requests to VIC and third parties, taking sworn testimony from Corteggiano and other VIC employees, and conducting informal interviews of representatives of CAISO and two companies from which VIC sought to purchase power for import at Cragview. During their testimony, VIC's employees were represented by counsel, who had the opportunity to ask questions.

29. On December 12, 2016, Enforcement issued a preliminary findings letter to VIC and Corteggiano setting forth Enforcement's initial view of the evidence, and seeking Defendants' response. On March 8, 2017, Defendants submitted a joint response to the preliminary findings, which included affidavits from three of VIC's employees. Corteggiano also submitted a separate response.

30. Enforcement continued to collect information relating to topics raised in Defendants' responses to the preliminary findings, which included taking sworn testimony from two VIC employees whose affidavits were included in VIC's response. Enforcement orally summarized the additional evidence for Defendants, who then, on June 7, 2017, submitted a joint written response to Enforcement's oral supplemental findings.

31.     Enforcement provided Defendants copies of all substantive, non-privileged materials from the investigative record, including testimony transcripts and responses of third parties to Enforcement's data requests and document subpoenas.

32.     Enforcement and Defendants conducted extended settlement negotiations, but were unable to reach a settlement.

33.     On June 22, 2018, Enforcement provided Defendants notice, pursuant to Section 1b.19 of the Commission's regulations, 18 C.F.R. § 1b.19, of its intent to recommend the initiation of a public adjudicative show cause proceeding against them (Rule 1b.19 letter).  Defendants submitted a joint response to the Rule 1b.19 letter on August 10, 2018, and a revised joint response on December 18, 2018.  On April 4, 2019, months after their response to the Rule 1b.19 letter was due, Defendants also submitted an "update" to their Rule 1b.19 letter response.

34.     Pursuant to Commission procedures, Enforcement provided a Staff Report to the Commission detailing Enforcement's findings and recommending the Commission issue an Order to Show Cause against Defendants.  Enforcement also provided the Commission copies of Defendants' initial and revised joint responses to Enforcement's Rule 1b.19 letter for the Commission's consideration in deciding whether to issue an Order to Show Cause.

**E.     The Commission's Adjudicative Proceeding**

35.     On July 10, 2019, the Commission issued an Order to Show Cause directing Defendants to show cause within 30 days why they should not be found to have violated FPA Section 222(a), 16 U.S.C. § 824v(a), and the Commission's Anti-Manipulation Rule, 18 C.F.R. § 1c.2,  and be ordered to pay the following amounts recommended in the Staff Report:  (A) a civil penalty of $6,000,000 and disgorgement of unjust profits of $1,227,143, plus interest, from VIC; and (B) a civil penalty of $800,000 from Corteggiano.  Issuance of the Order to Show Cause commenced a "contested on the record proceeding," subject to the Commission's Rules of Practice and Procedure.  *See* 18 C.F.R. Part 385 (Rules of Practice and Procedure); *see also* 18 C.F.R. §§ 385.209(a)(2) (providing for commencement of a proceeding by issuing an Order to Show Cause) and 385.2201(c)(1)(i) (defining proceeding arising from an investigation as a "contested, on the record proceeding").  The Order to Show Cause proceeding was an "adjudication" under the

Administrative Procedure Act (APA).  *See* Penalty Order ¶ 22 (citing the APA's definition of "adjudication" in 5 U.S.C. § 551(7) as an "agency process for the formulation of an order").

36.    On July 11, 2019, in accordance with its separation of functions and *ex parte* communications regulations, 18 C.F.R. §§ 385.2201 and 385.2202, the Commission issued a notice designating certain Commission staff as non-decisional and prohibiting them from communicating with advisory staff concerning the Commission's deliberations in the Order to Show Cause proceeding.

37.    On July 12, 2019, Enforcement filed the investigative record with the Commission, which included all of Defendants' substantive submissions to Enforcement, as well as information Enforcement gathered from third parties.  Enforcement also provided a copy of the investigative record to Defendants.

38.    On July 24, 2019, Defendants filed a joint motion for a four-week extension of time to respond to the Order to Show Cause.  Staff filed a reply opposing the motion.  On August 5, 2019, the Commission granted Defendants a two-week extension of time.

39.    In accordance with FPA Section 31(d)(1), 16 U.S.C. § 823b(d)(1), the Order to Show Cause notified Defendants of their statutory right to elect for the Commission to apply the procedures in FPA Section 31(d)(3)(A), 16 U.S.C. § 823b(d)(3)(A), to the proceeding.  That provision requires the Commission to "promptly assess" a penalty "by order."  On August 9, 2019, Defendants elected the procedures under FPA Section 31(d)(3)(A), thereby waiving their opportunity for a formal hearing before an administrative law judge under FPA Section 31(d)(2)(A), 16 U.S.C. § 823b(d)(2)(A) (which, if elected, would have been followed by Commission assessment of any penalty by order).  Based on Defendants' election, the Commission conducted a "paper hearing."

40.    On August 23, 2019, Defendants filed a joint answer to the Order to Show Cause and Corteggiano also filed a separate answer.  On September 20, 2019, Enforcement responded to Defendants' answers to the Order to Show Cause.

41.    On October 25, 2019, the Commission unanimously issued the Penalty Order (Exhibit 1 hereto) after reviewing the pleadings and the extensive investigative record, including

Defendants' numerous submissions to Enforcement.  The Commission determined VIC and Corteggiano violated FPA Section 222(a), 16 U.S.C. § 824v(a), and the Commission's Anti-Manipulation Rule, 18 C.F.R. § 1c.2, by selling physical power at a loss in CAISO's wholesale electric market to eliminate congestion costs in the Cragview LMPs that they expected to cause losses on VIC's CRR positions.  The Commission ordered VIC to pay a civil penalty of $1,515,738 and disgorge $1,227,143 in unjust profits, plus applicable interest.  The Commission also ordered Corteggiano to pay a $1,000,000 civil penalty.

42.    Defendants have failed to pay the penalties and disgorgement assessed by the Commission within the 60-day payment period provided for in Section 31(d)(3)(B) of the FPA, 16 U.S.C. § 823b(d)(3)(B), which ended on December 24, 2019.

**F.    The Parties' Tolling Agreements**

43.    On June 20, 2017, VIC and Corteggiano entered into tolling agreements with Enforcement that extend the running of any statute of limitations or other time-based limitation on the Commission's claims for 365 days beyond the otherwise applicable limitations period.

44.    On December 19, 2019, Enforcement and Defendants entered into an agreement that tolled any statute of limitations or other time-based limitation on the Commission's claims from December 25, 2019 (the first day the Commission was permitted to file its complaint under FPA Section 31(d)(3)(B), 16 U.S.C. § 823b(d)(3)(B)) to and including January 8, 2020.

**DEFENDANTS' TRADING BEHAVIOR**

**A.    Corteggiano Acquired Quarterly CCR Positions Sourced at Cragview**

45.    In December 2012, in CAISO's annual CRR auction, Corteggiano acquired on VIC's behalf quarterly CRR positions sourced at Cragview for all quarters of 2013.  The "sink" locations for the CRRs were at internal CAISO nodes.  The October to December 2013 quarterly CRR positions were approximately 42.9 MW during on-peak hours and 31.2 MW during off-peak hours.  VIC's quarterly CRR positions sourced at Cragview would earn money in any hour if the price at Cragview was lower than the price at the internal CAISO sink node (*i.e.*, when there was import congestion on the Cascade intertie) and lose money if the price at Cragview was higher than the internal CAISO sink node (*i.e.*, when there was export congestion on the Cascade intertie).

Complaint                                                13

**B.**      **A Partial Derate of the Cascade Intertie Caused Losses on VIC's CRRs**

46.      During two hours on October 18, 2013, for operational reasons, CAISO partially derated the Cascade intertie, setting the export capacity at 0 MW and the import capacity at 80 MW.  During those two hours, the price at Cragview was $388.11/MWh, which was extraordinarily high.  CAISO's published price data for Cragview showed that approximately $350/MWh of the $388.11/MWh price was due to congestion costs.  The high congestion costs caused VIC's CRR positions sourced at Cragview to lose approximately $30,700 during those two hours.  On Saturday, October 19, the Cascade intertie again was partially derated, this time for fourteen hours.  Once again, the price for all fourteen hours was $388.11/MWh.  VIC's CRR positions sourced at Cragview lost approximately $210,500 during those hours.

47.      CAISO also published net flow data showing that, during the partial derates on October 18 and 19, 2013, the net flow on the Cascade intertie was 0 MW.   In other words, during all of the hours in which the $388.11/MWh price appeared at Cragview, the net flow on the Cascade intertie was 0 MW.

48.      Corteggiano, who closely monitored market conditions within CAISO as part of his normal practice as a CRR trader, observed the partial derates on October 18 and 19, the $388.11/MWh price associated with the derates, the resulting losses on the CRR positions, and the 0 MW net flow on the Cascade intertie.  Corteggiano knew that liquidity at the Cascade intertie was generally low, which meant the reported 0 MW net flow on the intertie likely was 0 MW *actual* flow.  Corteggiano further understood that the absence of any flow meant CAISO had not accepted any bids and that the high congestion costs in the $388.11/MWh price therefore must have resulted from CAISO's use of an uncleared bid to set the price at Cragview.  As Corteggiano knew from his experience at Deutsche Bank and from the published materials from the Market Surveillance Committee's March 19, 2010, meeting, these were the conditions under which physical power flows in the opposite direction of the derate could be used to eliminate congestion costs.

49.      Corteggiano was aware that CAISO had scheduled similar partial derates of the Cascade intertie for October 28 through November 1, 2013, and again later in November and December.  He recognized that the planned derates could result in the same high congestion costs

Complaint                                                          14

that appeared on October 18 and 19, causing substantial losses on his CRRs sourced at Cragview. Corteggiano hedged against some of those potential losses by acquiring new CRRs for the months of November and December that ran in the opposite direction of his existing CRRs (*i.e.*, sinking, rather than sourcing, at Cragview).

50.     Corteggiano could not purchase counter-flow CRRs at Cragview for the last week of October because CAISO's monthly CRR auction for October had closed in September. Moreover, Corteggiano knew that CAISO would not publish the results of the November CRR auction until October 29, 2013, and that there was no guarantee that his bids for counter-flow CRRs for November 1 would be accepted.  If, as Corteggiano expected, the $388.11/MWh price reappeared during the scheduled partial derate from October 28 through November 1, 2013, VIC's CRRs sourced at Cragview would lose approximately $1.2 million.  Of that total, $240,000 would be lost on November 1 if the $388.11/MWh price reappeared that day.

**C.     Defendants Imported Power into CAISO at a Loss to Eliminate Congestion and Thereby Benefit the CRRs**

51.     After observing the initial CRR losses on October 18-19, 2013, Corteggiano immediately devised and began to execute a scheme to import physical power from the Pacific Northwest into California over the Cascade intertie to eliminate the anticipated congestion costs at Cragview and thereby prevent the anticipated $1.2 million in future losses on the CRRs during the partial derate scheduled for the week of October 28 through November 1, 2013.  Corteggiano was in a unique position to execute the scheme because he had learned from his trading at Deutsche Bank that at small, illiquid, partially derated interties such as Cascade he could substantially alter or eliminate the congestion costs by trading any quantity of power – even just 1 MW – in the opposite direction of the derate.  He was also aware of the materials published on CAISO's website from the March 2010 Market Surveillance Committee meeting explaining this mechanism for price manipulation.

52.     On the morning of Friday, October 18, 2013, Corteggiano enlisted two VIC employees to assist him in arranging to purchase power and submit bids in the day-ahead market at Cragview to import the power over the Cascade intertie.  One was a power trader and the other

was co-head of VIC's Operations function.  As a financial products trader, Corteggiano had neither the authority from VIC nor the capability to import physical power himself.

53.     Corteggiano and his colleagues could not complete the import transactions without involving others at VIC because VIC's compliance policy on trading "overlapping" products required prior consultation with management or the company's compliance function, which reported to VIC's General Counsel.  Accordingly, on Monday, October 21, 2013, Corteggiano asked to meet "ASAP" with his supervisor to discuss his proposed import transactions.  Corteggiano represented to his supervisor that VIC could profit by buying physical power in the Pacific Northwest at a relatively low price and selling it for import into CAISO at the extraordinarily high price of $388.11/MWh appearing at Cragview during the partial derates.  Corteggiano's supervisor directed him to obtain approval from VIC's legal/compliance group.

54.     Corteggiano represented to VIC's legal and compliance personnel that the purpose of the proposed imports at Cragview was to profit on the difference between prices for physical power in the Pacific Northwest and the $388.11/MWh price at Cragview, and not to benefit VIC's CRR positions.  The compliance officer directed him to ask CAISO whether the $388.11/MWh price was a "technological glitch or an error."  But Corteggiano did not ask that question.  Instead, he dictated questions for the Operations co-head to ask CAISO that were designed to ferret out information about how the $388.11/MWh price was formed.  The Operations co-head posed Corteggiano's dictated questions to CAISO in an e-mail on October 23, 2013.  In response, a CAISO representative said the price had been set by an "import bid," rather than an actual "import," which Corteggiano understood likely meant an uncleared bid had set the price.  That information, together with the fact that prevailing prices in both CAISO and the PacifiCorp-West control area were in the range of $40/MWh, informed Corteggiano that there was no actual demand for power at Cragview at the $388.11/MWh price.

55.     In describing the proposed import transactions to VIC's legal and compliance personnel, Corteggiano omitted key facts, including that VIC would lose $1.2 million on the CRRs sourced at Cragview if the $388.11/MWh price reappeared during the derate scheduled for the week of October 28 – November 1, 2013; the flow on the Cascade intertie during the October 18-19

partial derates was 0 MW, indicating the high congestion costs in the $388.11/MWh price must have arisen from CAISO's use of an uncleared bid to calculate the LMPs and there was no actual demand for power at the $388.11/MWh price; the CAISO representative had said an "import bid" set the price on October 18-19, further reinforcing that an uncleared bid set the price; prevailing prices in both CAISO and the PacifiCorp-West service areas were in the range of $40/MWh, indicating there was no actual market demand for power at $388.11/MWh at Cragview; and that Corteggiano had learned at Deutsche Bank that flowing any amount of power in the opposite direction of the derate at a partially derated intertie could substantially alter or eliminate congestion costs.

56. VIC's legal and compliance personnel approved Corteggiano's proposed import transactions at a level of just 5 MW per hour, based, in part, on their mistaken belief that small-volume bids would minimize the risk that VIC's transactions would affect the price at Cragview. They were unaware that flowing just 1 MW of power in the opposite direction of the derate could completely eliminate the $350/MWh in congestion costs at Cragview because Corteggiano failed to tell them that fact.

57. At Corteggiano's request, from October 18 to October 28, 2013, VIC's physical power traders and Operations co-head expended substantial time and effort to purchase power for import at Cragview, exhibiting significant flexibility on price and terms. Although Corteggiano had originally told the legal and compliance personnel that VIC could make a profit of approximately $1.7 million if the volume of the import transactions was 50 MW per hour, he was actually indifferent to the volume of the imports because he knew flowing just 1 MW of power in the opposite direction of the derate would eliminate the congestion costs threatening $1.2 million in losses on VIC's CRRs. Recorded communications from VIC employees seeking to purchase power for import at Cragview show that they sought to buy varying amounts of power from different potential sellers. VIC's Operations co-head told a counterparty "hell, I'd even take one megawatt."

58. On Friday, October 25, VIC's Operations co-head finalized a transaction with a counterparty to purchase 5 MW at $46/MWh to be delivered at Cragview on Monday, October 28.

On October 25, VIC offered 5 MW per hour for twenty-four hours into CAISO's day-ahead market for Monday, October 28. VIC offered the power at $1/MWh to ensure CAISO would accept VIC's bid. CAISO cleared VIC's bid and imported the power over the Cascade intertie. CAISO's published data showed that the net flow on the intertie was exactly the amount of VIC's bid, 5 MW, for all twenty-fours that VIC imported power over the intertie. VIC's imports eliminated the congestion costs that otherwise would have appeared in the Cragview LMPs, resulting in prices on October 28 that ranged from $31.71/MWh to $48.78/MWh. VIC lost approximately $1,000 on the October 28 physical power imports but avoided approximately $246,000 in losses on its CRRs.

59. The fact that the net flow on the Cascade intertie went from 0 MW to 5 MW during the hours of VIC's imports was a strong indicator that Defendants' 5-MW imports were the only cleared transactions at Cragview for October 28 and were responsible for eliminating the congestion costs. Although Defendants lost money on the import transactions on October 28, they decided to continue trading physical power at Cragview. On Monday October 28, at Corteggiano's instruction, one of VIC's physical power traders executed a second transaction with the same counterparty to purchase 5 MW of power for $48/MWh for 24 hours per day for the remainder of the week (October 29-November 1). On October 28, VIC once again submitted bids to import this power into the CAISO day-ahead market for $1/MWh for the period October 29-November 1. CAISO cleared the bids, the power was imported over the Cascade intertie, and the imports once again had the intended effect of eliminating the congestion costs that otherwise would have appeared during the hours of the partial derate, resulting in LMPs at Cragview that averaged approximately $40/MWh. Once again, the net flow on the Cascade intertie was 5 MW for every hour that VIC's imports flowed. VIC lost approximately $3,500 on the October 29-November 1 physical imports, but avoided approximately $1,000,000 in losses on its CRRs.

60. CAISO had scheduled additional partial derates of the Cascade intertie later in November and in December 2013 that offered the same purported opportunity for Defendants to profit on the $388.11/MWh price. However, Defendants did not trade physical power at Cragview after November 1, 2013. That is because Defendants never actually sought to profit on the $388.11/MWh price associated with the partial derates, but instead sought to eliminate the high

congestion costs reflected in that price for the benefit of their CRRs.  Having purchased counter-flow CRR positions for all of November and December that hedged their exposure to losses on the CRRs sourced at Cragview, Defendants no longer had any motive to trade physical power at Cragview.

### DEFENDANTS' CONDUCT MET THE THREE ELEMENTS OF MANIPULATION UNDER THE COMMISSION'S ANTI-MANIPULATION RULE

#### A.    Defendants Engaged in a Manipulative Scheme

61.    Defendants' conduct constituted a "manipulative or deceptive device or contrivance" within the meaning of FPA Section 222(a), 16 U.S.C. § 824v(a), and a "device, scheme, or artifice to defraud" within the meaning of the Commission's Anti-Manipulation Rule, 18 C.F.R. § 1c.2.  Defendants' manipulative conduct injected the false and deceptive information into CAISO's market that their import transactions were undertaken for the legitimate purpose of profiting on the imports, rather than Defendants' actual, illegitimate purpose of manipulating LMPs at Cragview to benefit VIC's CRRs.

62.    Corteggiano was the architect of the manipulative scheme and the primary actor responsible for the manipulation.  He devised the scheme, worked to facilitate its approval, and enlisted others to help implement the transactions necessary to carry it out, all to benefit CRR positions booked to his profit and loss account.

63.    The timing and pattern of Defendants' trading at Cragview are evidence of the manipulative scheme.  Defendants undertook the import transactions only after Corteggiano learned of his CRR losses on October 18 and 19, 2013, and they only sought to trade physical power on the days when VIC's CRR positions were susceptible to losses.  Before October 25, 2013, neither VIC nor Corteggiano had ever traded at Cragview.  Neither VIC nor Corteggiano traded at Cragview after November 1, 2013, even though partial derates were scheduled on the Cascade intertie later in November and December.  Corteggiano had never before sought to trade physical power at VIC in response to a high price signal.  His only physical trading in the past had been part of an alleged manipulative scheme when he was employed at Deutsche Bank.  VIC as a whole rarely traded

physical power in CAISO, and then did so primarily at liquid trading hubs, and not at small, illiquid interties such as Cascade.

64.     Defendants' indifference to the profitability of the physical power trades at Cragview is also evidence of the manipulative scheme.  Defendants' import transactions at Cragview lost money every day from October 28 to November 1, 2013.  From the first day of trading, it was clear that, as Corteggiano expected, Defendants' physical trades eliminated the congestion costs in the Cragview LMPs and therefore the high price Defendants supposedly were expecting to profit on.  After seeing their losses on the imports on October 28, Defendants continued to trade at Cragview each day for the rest of the week.  Although Defendants submitted the bids for October 29 – November 1 all together on October 28, CAISO's market rules permitted them each day to withdraw the bids they had submitted for the next day and attempt to sell the power somewhere other than Cragview to avoid the impacts Defendants' imports clearly were having on the Cragview LMPs.  Defendants did not do so because the imports had the intended effect of eliminating the congestion costs in the Cragview LMPs.

65.     Defendants' indifference to the quantity of power they purchased for import also evinces the manipulative scheme.  They would not have invested the time and effort of multiple employees just to "take one megawatt" or the 5 MW they ultimately purchased for import over the Cascade intertie if their goal was actually to profit from the physical import transactions.  However, executing a small deal made sense to achieve the goal of eliminating congestion costs at Cragview because any amount of power flowing in the opposite direction of the derate would serve that purpose.

**B.     Defendants Acted Knowingly and Intentionally**

66.     Defendants acted with the requisite scienter under FPA Section 222 and the Commission's Anti-Manipulation Rule.  Defendants, individually and together, knowingly and intentionally participated in the manipulative scheme to import power at the Cascade intertie to eliminate congestion and thereby economically benefit VIC's CRR position.

67.     Defendants had a clear economic motive to undertake the manipulative scheme because they faced approximately $1.2 million in losses on the CRRs if the $388.11/MWh price

Complaint                                    20

1   reappeared during CAISO's scheduled partial derates from October 28 through November 1, 2013.

2   Corteggiano's compensation at Vitol was based on the profitability of his trading, and a $1.2 million

3   loss on the CRRs would have reduced his trading profitability in 2013 by approximately ten percent.

4       68.    Corteggiano had the knowledge to carry out the manipulative scheme.  He knew that

5   trading physical power in the opposite direction of the derate at a partially derated intertie could

6   eliminate the congestion costs.  Corteggiano testified under oath in Enforcement's investigation of

7   the trading at Cragview that he knew no congestion would appear on the Cascade intertie if the net

8   flow during the partial derates was greater than zero and less than 80 MW.  CAISO's published

9   data during Defendants' trading at Cragview showed that the net flow on the intertie was 5 MW,

10  which was exactly the volume of Defendants' imports.

11      69.    Defendants' deviation from their normal trading pattern further evinces their

12  manipulative intent.  VIC rarely traded physical power, and Corteggiano had done so only once

13  before, in early 2010, at the Silver Peak intertie as part of the alleged manipulative scheme in the

14  *Deutsche Bank* matter.  One of the potential counterparties that Defendants contacted to purchase

15  power for import at Cragview declined to deal with Defendants because the counterparty suspected

16  Defendants' manipulative purpose.  That suspicion arose in part because VIC was known in the

17  market as a financial energy products trader, not a physical trader, and because Defendants

18  appeared to have little understanding of how to complete the physical power transaction at

19  Cragview.

20      70.    Before and during the period of Defendants' manipulative trading at Cragview,

21  Corteggiano had data on both historical and then-prevailing energy prices indicating that there was

22  no market demand for power at Cragview at the exceptionally high price of $388.11/MWh.  The

23  counterparty that declined to deal with Defendants suspected their manipulative intent based in part

24  on the fact that the price Defendants were willing to pay for power to import at Cragview was

25  generally above the prevailing market prices in the area, suggesting that the transaction would not

26  be profitable for Defendants on a stand-alone basis.

27

28

Complaint                                    21

71.     The timing of Defendants' trading at Cragview also evinces their manipulative intent.  Defendants traded at Cragview only during the period their CRRs sourced at Cragview were susceptible to losses from the reappearance of the $388.11/MWh price at Cragview.

72.     Defendants' manipulative purpose is also reflected in their decision to continue trading at Cragview after seeing on October 28, 2019, that their trading on that day had eliminated the congestion costs at Cragview and had lost money.   Defendants were indifferent to the profitability of the physical trades.

73.     Corteggiano's own e-mails show his real concern was avoiding CRR losses, not making a profit on the physical power imports.  Corteggiano copied his fellow financial products trader at VIC on an e-mail relating to the Cragview transaction; however, like Corteggiano, he was not a physical power trader and there was no reason to copy him other than their shared interest in the effect the Cragview transactions would have on VIC's CRRs.  In an e-mail on October 27, 2019, VIC's Operations co-head asked what the day-ahead pricing at Cragview was for October 28, and Corteggiano's first words in response were "No congestion on the intertie for tomorrow (export or import)."  Because CRRs settle based on differences in congestion costs, Corteggiano's focus on congestion costs shows his concern was the impact the imports would have on VIC's CRRs, not the profitability of the import transaction (which would depend on the overall LMP, not just the congestion costs).

**C.      Defendants' Scheme was Jurisdictional**

74.     Defendants' conduct occurred "in connection with" transactions subject to the Commission's jurisdiction.  Defendants conducted both the physical import transactions and the CRR transactions in a market operated by a Commission-regulated independent system operator pursuant to a Commission-approved tariff.

**D.      Remedies and Sanctions**

75.     The Commission assessed civil penalties of $1,515,738 against VIC and $1,000,000 against Corteggiano.   The Commission found these penalties to be statutorily authorized under the FPA and appropriate based on the penalty factors set forth in FPA Section 316A(b), 16 U.S.C. § 825o-1(b).   In determining the appropriate penalties, the Commission considered that Defendants

Complaint                                                        22

caused $2,515,738 in market harm in the form of (a) $2,429,385 in reduced funding of CAISO's CRR Balancing Account, and (b) $86,353 in losses suffered by other market participants holding CRR counter-flow positions at Cragview. The Commission also considered several other aggravating and mitigating factors. Significant in the Commission's determination of Corteggiano's penalty was that he conceived, directed, and participated in the manipulative scheme.

76. The Commission also ordered VIC to disgorge all of its unjust profits from the manipulative scheme, which amounted to $1,227,143, plus interest.

77. Plaintiff respectfully submits that this Court can and should affirm and enforce the Commission's penalty assessments and disgorgement order without modification as set forth in the Penalty Order.

## CLAIM FOR RELIEF

(Against Both Defendants for Violating FPA Section 222, 16 U.S.C. § 824v, and the Commission's Anti-Manipulation Rule, 18 C.F.R. § 1c.2)

78. The Commission restates and incorporates by reference Paragraphs 1 through 77, inclusive, as if set forth fully herein.

79. Defendants used or employed a fraudulent device, scheme, or artifice, or engaged in an act, practice, or course of business that operated as a fraud or deceit, with scienter, in connection with electric energy subject to the jurisdiction of the Commission in contravention of FPA Section 222, 16 U.S.C. § 824v, and the Commission's Anti-Manipulation Rule, 18 C.F.R. § 1c.2. Each of the import transactions that Defendants submitted to CAISO constituted a separate violation of FPA Section 222, 16 U.S.C. § 824v, and the Commission's Anti-Manipulation Rule, 18 C.F.R. § 1c.2.

80. Accordingly, the Commission is entitled to an Order from this Court affirming its assessment of civil penalties against Defendants under FPA Section 31(d)(3)(B), 18 U.S.C. § 823b(d)(3)(B), and ordering Defendant VIC to disgorge its unjust profits, plus interest.

## REQUESTED RELIEF

**WHEREFORE**, the Commission respectfully requests that this Court:

1    (A)    Enter an order and judgment affirming the Commission's assessment of a

2  $1,515,738 civil penalty against Defendant VIC.

3    (B)    Enter an order and judgment affirming the Commission's assessment of a

4  $1,000,000 civil penalty against Defendant Corteggiano.

5    (C)    Enter an order requiring Defendant VIC to disgorge $1,227,143 in unjust profits,

6  plus interest.

7    (D)    Order such other and further relief as the Court may deem necessary and

8  appropriate.

9

10  DATED:  January 6, 2020                FEDERAL ENERGY REGULATORY COMMISSION

11                                          LARRY PARKINSON
                                           Director, Office of Enforcement
12

13                                          GEO. F. HOBDAY, JR.
                                           Director, Division of Investigations
14

15

16                          By:    /s/ *Carol Clayton*
                                   CAROL CLAYTON
17                                 CATHERINE C. COLLINS
                                   KEVIN DINAN
18                                 MARK KOEHN
                                   JOHN R. MATSON III
19                                 Office of Enforcement
                                   Federal Energy Regulatory Commission
20                                 888 1st Street, N.E.
                                   Washington, D.C. 20426
21                                 Telephone: 202-502-8100
                                   Carol.Clayton@ferc.gov
22                                 Catherine.Collins@ferc.gov
                                   Kevin.Dinan@ferc.gov
23                                 Mark.Koehn@ferc.gov
                                   Jay.Matson@ferc.gov
24
                                   Attorneys for Plaintiff
25

26

27

28

Complaint                              24