UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Federal Energy Regulatory Commission, | No. 2:20-CV-00040-KJM-AC |
| Plaintiff, | ORDER |
| v. | |
| Vitol Inc., et al., | |
| Defendants. | |

The Federal Energy Regulatory Commission (FERC) found that Vitol Inc. (Vitol) and one of its employees, Federico Corteggiano, manipulated wholesale electrical power prices to reduce Vitol's losses in California's specialized electricity market allowing for the offsetting of risks of high congestion costs.  The Federal Power Act (FPA) permits FERC, as here, to seek this court's review of FERC's finding and the civil penalties FERC assessed against Vitol and Corteggiano. Vitol and Corteggiano have moved to dismiss and to stay.  As explained in this order, Vitol's motion to dismiss is **denied**, its motion to stay is **denied as moot**, and Corteggiano's motion is **denied for the most part, but granted to the extent the court finds FERC may not assess a larger penalty than it previously proposed.**

I.      REQUEST FOR JUDICIAL NOTICE

The court begins by clarifying the record on which its decision rests, by addressing Vitol's requests for judicial notice of several documents.  *See* Req. J. Notice, ECF No. 31 & Suppl. Req.

1

1  J. Notice, ECF No. 54.  A court may "take judicial notice of adjudicative facts 'not subject to

2  reasonable dispute.'" *United States v. Chapel,* 41 F.3d 1338, 1342 (9th Cir. 1994) (quoting Fed.

3  R. Evid. 201(b)).  "Adjudicative facts are simply the facts of the particular case."  Advisory Notes

4  to Fed. R. Evid. 201.  Judicial notice may be taken at any stage, Fed. R. Evid. 201(d), including

5  when resolving a motion to dismiss for failure to state a claim under Rule 12(b)(6), and doing so

6  does not convert such a motion into a motion for summary judgment, *see United States v. Ritchie*,

7  342 F.3d 903, 907–08 (9th Cir. 2003).

8          Although Rule 201 refers to facts, litigants often request judicial notice of documents

9  wholesale, as Vitol does here.  This practice, although often an efficient method of avoiding

10  unnecessary evidentiary wrangling, can also lead to confusion and disputes.  For example, Rule

11  201 permits judicial notice of facts that are "not subject to reasonable dispute" because they "can

12  be accurately and readily determined from sources whose accuracy cannot reasonably be

13  questioned," and a document might serve as such a source.  *See Khoja v. Orexigen Therapeutics,*

14  *Inc.*, 899 F.3d 988, 999 (9th Cir. 2018).  An investor conference call transcript submitted to a

15  regulator might therefore be an accurate and reliable source of information about when the

16  conference call occurred, for example.  *See id.* at 999–1000.  A litigant who wishes to rely on that

17  fact could request judicial notice of the date and could cite the transcript as a "source" under

18  Rule 201(b)(2).  But a document that can serve as a proper source to "accurately and readily

19  determine" some facts might not be a proper source for other facts.  For example, the investor call

20  transcript might not show what listeners actually learned on that call, so judicial notice of their

21  knowledge would not be appropriate, even if every word had been recorded accurately.  *See id.*

22  The sheer volume of information that can often be derived from a "source" document presents

23  another problem.  A great deal of that information might be irrelevant and thus outside the

24  boundaries of "adjudicative" facts.  *See id.* at 1000 n.5.

25          To avoid these potential pitfalls, the court will not grant or deny Vitol's request for

26  judicial notice generally; the court instead considers specific facts.  When those facts are relevant,

27  when they are not subject to reasonable dispute, and when they can accurately and readily be

28  determined from the documents attached to Vitol's requests for judicial notice, the court takes

2

1    judicial notice of them and relies on them.  The court does not cite or rely on facts that do not

2    meet the Rule 201 standard.  Vitol's requests for judicial notice are granted in part and denied in

3    part to this extent.

4         Two parts of Vitol's requests for judicial notice require more detailed discussion.  First,

5    Vitol requests judicial notice that a certain pricing algorithm could produce "artificial" prices.

6    *See* Vitol Mot. at 10 n.6, ECF No. 30; Req. J. Not. Ex. A at 8, ECF No. 31-4.  This request for

7    judicial notice can be resolved without considering the details of the algorithm or whether the

8    prices it produces are truly "artificial."  For now, it is enough to recognize that Vitol's request is

9    part of its argument that "artificial" prices are not "market" prices, so if a trading strategy brings

10   an "artificial" price in line with a "market" price, that strategy would not be manipulative or

11   deceptive.  *See* Mot. at 10.  The source document Vitol cites does not establish the facts it wants

12   noticed beyond dispute.  The document shows only that its author described certain prices as

13   "artificial."  *See* Req. J. Not. Ex. A at 8.  FERC's complaint will not stand or fall on that word

14   choice, but rather on the overall plausibility of its allegations that Vitol and Corteggiano

15   manipulated power markets.  Nor does a word choice show beyond dispute that a price is truly

16   "artificial" in the sense Vitol contends.

17        Second, Vitol requests judicial notice that in another case, FERC described a "price-taker"

18   as "an individual or company that must accept prevailing prices in a market, lacking the market

19   share to influence market price on its own."  *See PPL Elec. Util. Corp.*, 147 FERC ¶ 61,028

20   (2016), Req. J. Notice Ex. D at 2 n.5.  The court takes judicial notice that FERC used this

21   definition of "price-taker" in its previous decision.  The fact of usage is beyond dispute.  It is also

22   relevant: FERC used the term "price-taker" in this case as well when it described Vitol's

23   allegedly manipulative bids.  *See* Penalty Order ¶ 101, ECF No. 1-1.  Its previous definition can

24   show what it meant when it used that term.  The court does not take judicial notice, however, that

25   "price-takers," so defined, cannot violate the FPA's antimanipulation rules.  As described later in

26   this order, that is a disputed legal question not amenable to notice.

27        With these preliminary matters resolved, the court turns to FERC's allegations against

28   Vitol and Corteggiano.

## II.    BACKGROUND

Traditionally, markets for wholesale electrical power were vertically integrated.  *See* Fed. Energy Reg. Comm'n, "Electric Power Markets" (July 20, 2021);[1] *F.E.R.C. v. Elec. Power Supply Ass'n*, 577 U.S. 260, 267 (2016).  Utilities owned the power plants, the electrical lines and other parts of the infrastructure that transmits power to the people who use it.  *Supply Ass'n*, 577 U.S. at 267.  But since the FPA was passed in the 1930s, "electricity has increasingly become a competitive interstate business."  *Id.*  In the 1990s, FERC also issued rules promoting competitive change to the traditional structure.  *See supra* "Electric Power Markets" (citing Fed. Energy Reg. Comm'n Order No. 888, 75 FERC ¶ 61,000 (Apr. 24, 1996)).  Its goal was to increase competition in power markets by separating transmission from production and consumption.  *See id.*  In response to these rules, separate entities began operating transmission systems; they are known as independent system operators, or "ISOs."  *See id.*  Today, about two thirds of the electricity in the United States is distributed in areas managed by ISOs and similar regional organizations.  *See id.*

An ISO known as the California Independent System Operator, "CAISO" for short, operates the power transmission infrastructure in most of California and some of Nevada.  *See id.*; Compl. ¶¶ 1, 15, ECF No. 1.  CAISO also operates a market for power transmitted within, into, and out of its borders.  *Id.* ¶ 15.  In these markets, buyers and sellers trade power transmitted to and from specific locations.  *See id.* ¶ 16.  Trading locations within CAISO's control are called "nodes," and trading locations at the borders between CAISO's boundaries and areas controlled by other entities are called "interties."  *Id.*  At interties, power is exported when it leaves the area controlled by CAISO, and it is imported when it enters.  *Id.*  These trading locations correspond to real places: they are on the power grid in California and Nevada.  *See id.* ¶ 24.  The events described in FERC's complaint concern electricity transmissions at a node located in Siskiyou and Shasta Counties and over an intertie with a neighboring zone.  *See id.* ¶¶ 9, 24.  That node,

---

[1] https://www.ferc.gov/industries-data/market-assessments/overview/electric-power-markets, last visited July 21, 2021.  The court takes judicial notice of this general history, as it is readily available and subject to no dispute.  *See* Fed. R. Evid. 201(b)(2); *Khoja*, 899 F.3d at 999.

4

1   the "Cragview node," is associated with the Cragview electrical bus,[2] which connects CAISO's

2   system to a neighboring grid via the "Cascade intertie," which is a power transmission line with a

3   relatively small import and export capacity.  *Id.* ¶ 24.

4    Markets for electricity are unlike many others.  Electricity cannot be stored effectively in

5   large quantities, so it must be generated at almost exactly the moment it is consumed.  *See id.*

6   ¶ 17.  And unlike the demand for many other goods, the demand for electricity changes relatively

7   little in response to price changes.  *See id.*  People turn on their air conditioners when it is hot, no

8   matter what price signals might be flashing.  *See Elec. Power Supply Ass'n*, 577 U.S. at 269–70.

9   This means CAISO must transmit exactly the amount of power that consumers demand exactly

10   when they demand it, even when prices are swinging.  *See* Compl. ¶ 17.  To do this, CAISO

11   forecasts the amount of electricity available for sale and demanded for purchase, and it schedules

12   generators on an hourly basis the day before power will be transmitted.  *Id.*  Buyers and sellers

13   are then matched in a "day-ahead" market.  *Id.*  Predictions are rarely perfect, so CAISO also

14   operates a second market for real-time transmissions, and it adjusts generation schedules to

15   account for the differences between the day-ahead market and real-time power needs.  *Id.*

16    Trades in CAISO's markets settle at prices determined by software algorithms.  *See id.*

17   ¶ 18.  These algorithms take into account the trading location, the bids CAISO receives for that

18   location, the limits of the infrastructure in that place, and the efficiency and reliability of the

19   infrastructure.  *Id.*  As a result, the prices have three basic components.  *Id.* ¶ 19.  The first is the

20   basic commodity price—the "system marginal cost of energy"—, which is the same at all

21   locations in the system, but which changes over time.  *Id.*  The second component incorporates

22   costs specific to the location.  *Id.*  These costs rise when the grid is "congested," i.e., when

23   demand outstrips transmission capacity and CAISO must depart from the most efficient schedules

24   or lowest-cost power sources.  *See id.*  The second component is thus known as the "marginal cost

25   of congestion."  *See id.*  The third price component accounts for power losses as electrical energy

---

[2] An "electrical bus" is a physical location on the transmission system within the PacifiCorp-West Balancing Authority Area.  The Cragview electrical bus is connected to CAISO through a single, 115 kV transmission line, which is commonly referred to as the "Cascade intertie."  Penalty Order ¶ 6.

1    turns into heat energy en route to its destination, and it is known as the "marginal loss cost."  *See*

2    *id.*  The second congestion component is the primary reason prices differ from one location to the

3    next; the loss component is "typically very small" in comparison.  *Id.*

4           In addition to the markets for physical power, CAISO also operates a market for a

5    financial product known as a "congestion revenue right" or "CRR."  *See id.* ¶ 21.  CRRs can

6    offset the risks of high congestion costs.  *Id.*  Each CRR is specific to a location, time and

7    direction of power transmission.  *Id.*  CRRs can either pay returns or incur charges.  *See id.* ¶¶ 2,

8    21–22.  If congestion is high at the specified location and time and in the specified direction, then

9    the CRR pays a return to its holder.  *See id.*  If congestion runs in the opposite direction at the

10   specified location and time, then the holder incurs a charge.  *See id.* ¶ 22.  Buying a CRR thus

11   amounts to a bet that a given transmission path will be congested, or not, at a particular time.  *Id.*

12   CRRs are available at annual and monthly auctions and are traded on a secondary market.  *Id.*

13          This case is about a trading strategy that overlaps CAISO's wholesale electric markets:

14   "day ahead," real time and CRR on the one hand, and physical power trades on the other.  The

15   story starts more than a decade ago, in early 2010, when FERC learned that traders at Deutsche

16   Bank had used physical power trades to reduce losses in positions the bank held in the CRR

17   market.  *See id.* ¶¶ 26–27.  The trading strategy relied on the effects of restrictions that CAISO

18   sometimes places on the maximum import and export capacities of an intertie.  *See id.*  These

19   restrictions are known in the business as "derates."  *See id.* ¶ 26.  Derates can be partial.  *See id.*

20   That is, capacity may be restricted to zero or partially derated, but in only one direction.  *See*

21   *id.* ¶ 46.  Consider the market for power transfers over a derated intertie: it might seem as though

22   asking for bids to buy and sell power over an intertie with zero capacity would be an exercise in

23   futility, but it is not.  CAISO can clear bids to transfer power over a derated intertie if the import

24   and export bids are equal in the derated direction.  *Id.*  In other words, the net effect of a

25   megawatt transmitted in one direction plus a megawatt transmitted in the opposite direction is

26   zero megawatts transmitted.  *See id.*  As a result, bids to transfer power over a derated intertie

27   might not clear, meaning CAISO will not import the power over the intertie, but will still accept

28   the bid.  *See id.* ¶ 58.

1          In 2010, CAISO's pricing algorithm incorporated these uncleared bids into market prices

2   for the partially derated intertie.  *See id.*; *see also id.* Ex. 1 ¶ 38; Req. J. Not. Ex. A at 8–9, ECF

3   No. 31-1.  Because CAISO also calculated congestion by reference to these uncleared bids, even

4   a partially derated intertie could be congested, a somewhat counterintuitive result in light of the

5   fact that no power was flowing.  *See id.* ¶ 26.  Some have described this effect as "phantom

6   congestion."  *See id.* ¶ 26; *id.* Ex. A ¶ 53 & n.157.

7          Deutsche Bank's trading strategy at issue here relied on a quirk in the congestion prices

8   that occurred when power transmissions at derated interties were very low.  If the conditions were

9   right, then a single bid to transmit electricity, even a relatively tiny amount, could eliminate most

10  of the reported congestion cost.  *See id.*  This fact had lucrative implications for a holder of a

11  CRR who was set to incur charges if congestion prices were high at a partially derated, low-

12  volume intertie.  A trader could wipe away most of the congestion cost, and therefore the looming

13  CRR charge, by paying a relatively small amount of money for a relatively small amount of

14  electricity to flow over that intertie.  *See id.* ¶¶ 26–27.  Congestion costs would plummet, and

15  expected losses along with them.  *See id.*

16         According to FERC, Federico Corteggiano successfully executed this strategy in 2010 at

17  Deutsche Bank.  *See id.* ¶ 27.  FERC pursued a regulatory claim against Deutsche Bank for

18  manipulative trading, and that claim eventually settled.  *See id.* (citing *Deutsche Bank Energy*

19  *Trading, LLC*, 142 FERC ¶ 61,056 (2013)).  The bank agreed to pay a civil penalty and disgorge

20  its profits from the trade.  *See id.*  CAISO then condemned the strategy as price manipulation in a

21  public presentation to market participants.  *See id.* ¶ 26.

22         A few years later, in late 2013, someone approached FERC confidentially with a tip that a

23  different firm had used the same cross-market strategy to reduce its CRR losses.  *See id.* ¶ 28.

24  FERC opened an investigation.  *Id.*  It learned that the same trader who had been a part of the

25  Deutsche Bank investigation, Federico Corteggiano, had moved to a new firm—Vitol—and had

26  again used unprofitable trades in the physical power market to defray losses in the financial

27  markets.

1   The foundation of Corteggiano's allegedly manipulative trading scheme was laid in late

2   2012, when he purchased CRRs on Vitol's behalf for the year 2013, including for congestion at

3   the Cragview node and Cascade intertie, the Siskiyou and Shasta County trading locations noted

4   above.  *Id.* ¶ 45.  Several months after Corteggiano bought the CRRs, in October 2013, CAISO

5   partially derated the Cascade intertie.  *See id.* ¶¶ 46–47.  Congestion prices jumped even though

6   no power had flowed.  *See id.*  Vitol incurred hundreds of thousands of dollars in losses in a

7   matter of hours.  *See id.* ¶ 46.

8   More derates were scheduled in the coming weeks, and Vitol's losses would mount if

9   Corteggiano did nothing.  *See id.* ¶ 49.  He acquired CRRs in the opposite direction to

10  counterbalance some of these expected losses, but it was not enough; about a week before the

11  next scheduled derate, Vitol was still set to lose at least $1 million.  *See id.* ¶¶ 49, 51.

12  Corteggiano decided to try the strategy that had worked at Deutsche Bank: erasing high

13  congestion costs by importing a small amount of power over the Cascade intertie.  *See id.*

14  Corteggiano had no authority to buy or sell physical power.  *Id.* ¶ 52.  He enlisted another

15  Vitol trader and a manager from Vitol's operations group.  *See id.*  Vitol's policies also required

16  Corteggiano to consult its general counsel before trading in two related products.  *Id.* ¶ 53.  He

17  asked his supervisor to talk as soon as possible.  *Id.*  When the two spoke, however, Corteggiano

18  did not explain his true goal.  He instead explained the plan as an attempt at price arbitrage:

19  buying physical power outside CAISO's territory at a low price and selling it inside CAISO's

20  territory at a high price.  *See id.*  To the uninitiated, this was a plausible story.  Prices at Cragview

21  were extraordinarily high.  *See id.*  If Corteggiano was correct, an arbitrage attempt would fail

22  miserably, because even a relatively tiny transmission could erase the high reported price, but his

23  supervisor did not know this.  *See id.*

24  The supervisor told Corteggiano to check with legal.  *See id.*  Corteggiano told Vitol's

25  legal and compliance personnel the same story.  *Id.* ¶ 54.  He said nothing about looming losses in

26  the CRR market or the likely effect of his proposed imports.  *See id.* ¶ 55.  A compliance officer

27  told him to check with CAISO: was the high price a glitch or an error?  *Id.* ¶ 54.  Corteggiano did

28  not ask that question of CAISO.  *Id.*  Instead, he asked questions designed to confirm his theory

1    that the high prices were the result of an uncleared bid.  *See id.*  It worked.  Corteggiano learned

2    there was no demand for power at the reported price.  *Id.*  Prices in nearby areas were much

3    lower, about ten times lower.  *See id.*

4         Vitol's legal department blessed the proposed trades, but it limited Corteggiano to five

5    megawatts per hour, believing incorrectly that a bid of that volume would not affect market

6    prices.  *See id.* ¶ 56.  This was no problem for Corteggiano; even one megawatt would suffice for

7    his purposes.  *See id.* ¶¶ 56–57.  Vitol's physical power traders arranged for the proposed trades.

8    *See id.* ¶ 57.  They seemed to care little about the terms of these transactions, offering to accept a

9    single megawatt and to sell their imports for as little as a dollar per megawatt hour.  At least one

10   entity on the other side of these trades later claimed it was suspicious.  *See* Staff Report at 17–18,

11   Req. J. Not. Ex. E at 27–28, ECF No. 31-5.[3]  It said it had taken note of Vitol's willingness to pay

12   high prices and suspected Vitol had an ulterior motive.  *See id.*

13        After the trades went through, congestion prices at the Cascade intertie dropped, just as

14   Corteggiano had expected.  *See id.* ¶¶ 58–59.  So, in exchange for a few small, unprofitable trades

15   in the physical power market, Vitol avoided more than $1 million in losses in its CRR positions.

16   *See id.*  As noted above, however, FERC got wind of this success and began an investigation into

17   whether Vitol and Corteggiano had violated the FPA, which prohibits manipulative and deceptive

18   trading in markets within FERC's jurisdiction.  *See id.* ¶ 28; 16 U.S.C. § 824v(a); 18 C.F.R.

19   § 1c.2(a).

20        FERC's Enforcement Office investigated the matter for about three years.  *See* Compl.

21   ¶¶ 28–29.  The investigation included document subpoenas, requests for data from Vitol and

22   others, taking sworn testimony from Corteggiano and other Vitol employees, and conducting

23   informal interviews with CAISO and other market participants.  *See id.* ¶ 28.  After its

24   investigation, the Enforcement Office concluded preliminarily that Vitol and Corteggiano had

25   both violated the anti-manipulation statute relevant here, FPA section 222(a).[4]  It informed Vitol

---

[3] The court takes judicial notice of this fact, which the parties do not dispute, and which
satisfies the conditions of Rule 201(b)(2).

[4] "It shall be unlawful for any entity . . . to use or employ, in connection with the purchase
or sale of electric energy or the purchase or sale of transmission services subject to the

1    and Corteggiano of that conclusion.  Three more years passed as FERC collected more

2    information, took more sworn testimony, and reviewed Vitol's and Corteggiano's responses.

3    *Id.* ¶¶ 29–33.  FERC, Vitol and Corteggiano also attempted to negotiate a settlement agreement.

4    *See id.* ¶¶ 30–34.  After their negotiations were unsuccessful, FERC decided to pursue a civil fine

5    and a disgorgement of profits from both Vitol and Corteggiano.  *See id.* ¶¶ 32–34.

6            The FPA requires FERC to give notice before imposing any civil penalties.  *See* 16 U.S.C.

7    § 823b(d)(1).  FERC complies with this statute by issuing "orders to show cause."  *See* 18 C.F.R.

8    § 385.209(a)(2); Compl. ¶ 35.  In this case, FERC ordered Vitol to show cause why it should not

9    pay a civil penalty of $6 million and disgorge about $1.2 million in profits, and it ordered

10   Corteggiano to show cause why he should not pay a civil penalty of $800,000.  *Id.* ¶ 35.

11           An order to show cause starts a process FERC's regulations describe as a "contested on-

12   the-record proceeding."  18 C.F.R. § 385.2201(b); *see also id.* § 385.2201(c)(1).  As this moniker

13   implies, FERC prohibits off-the-record communications between any third parties and the FERC

14   employees deciding whether a violation occurred.  *See id.* § 385.2201(b).  FERC's regulations

15   also separate its staff by function during contested on-the-record proceedings.  *See id.* § 385.2202.

16   If a FERC employee, officer or agent is a part of the commission's efforts to "work upon the

17   proceeding or to assist in the trial thereof," that person may not advise the agency's decision

18   makers about the case except as a witness or counsel in a public hearing.  *See id.* § 385.2202.

19           An order to show cause must inform its recipient of two possible paths to a resolution.

20   *See* 16 U.S.C. § 823b(d)(1).  First, if the alleged violator does nothing, an administrative law

21   judge conducts a hearing on the record and decides whether to assess a penalty.  *See id.*

22   § 823b(d)(2)(A).  If a penalty is assessed, the violator has 60 days to begin an action contesting

23   the penalty in the federal court of appeals for the appropriate circuit.  *See id.* § 823b(d)(2)(B).

24   Because this first procedure occurs if the alleged violator does nothing, it is often described as the

25   "default" procedure.  *E.g.*, *FERC v. Powhatan Energy Fund, LLC*, 949 F.3d 891, 894 (4th Cir.

---

jurisdiction of the Commission, any manipulative or deceptive device or contrivance . . . " 16
U.S.C. § 824v.

1   2020).  A case follows the second path if an alleged violator elects to forego the administrative

2   procedure.  *See id.* § 823b(d)(1).  If the alleged violator chooses this "alternate" option, FERC

3   must assess a penalty "promptly."  *Id.* § 823b(d)(3)(A).  If the alleged violator does not pay the

4   penalty within 60 days, the FPA permits FERC to file an action against the alleged violator in the

5   appropriate United States district court.  *Id.* § 823b(d)(3)(B).  The district court reviews the law

6   and facts de novo and can enforce the penalty as assessed, enforce a modified penalty or set the

7   penalty aside.  *See id.*  Appellate review is then available under the generally applicable federal

8   law and civil rules.  *See, e.g.*, *Powhatan*, 949 F.3d at 896 (reviewing interlocutory appeal of

9   action following this "alternate" path).  The alleged violator has thirty days to decide which path

10  to pursue after it receives an order to show cause.  *See* 16 U.S.C. § 823b(d)(1).

11         Here, Vitol and Corteggiano opted for the "alternate" procedure.  Compl. ¶ 39.  FERC

12  issued a penalty order.  *See id.* ¶ 41.  It found Vitol and Corteggiano had violated section 222(a)

13  and the antimanipulation rule.  *Id.*  It ordered Vitol to pay a civil penalty of about $1.5 million

14  and to disgorge about $1.2 million, and it ordered Corteggiano to pay a $1 million civil penalty.

15  *Id.*  Vitol and Corteggiano did not pay the penalties, so FERC filed this action under

16  § 823b(d)(3)(B).  *Id.* ¶ 42.

17  **III.   MOTION TO DISMISS**

18         As noted above, Vitol and Corteggiano move to dismiss FERC's complaint.  *See* Vitol

19  Mot.; Corteggiano Mot., ECF No. 33.  Vitol also moves to stay this case until the court resolves

20  the motions to dismiss.  Mot. Stay, ECF No. 36.  FERC opposes all three motions.  Opp'n

21  Dismiss, ECF No. 38; Opp'n Stay, ECF No. 40.  Vitol and Corteggiano have replied.  Vitol

22  Reply, ECF No. 55; Corteggiano Reply, ECF No. 56; Stay Reply, ECF No. 52.  The court has

23  also received and permitted an amicus curiae brief in support of Vitol's motion, filed by the

24  Edison Electric Institute (EEI), Electric Power Supply Association (EPSA) and Energy Trading

25  Institute (ETI).  *See* Amicus Br., ECF No. 42-1; Order, ECF No. 60.

26         The court heard arguments on August 27, 2020 by videoconference.  Minutes, ECF

27  No. 59; Aug. 27 Hr'g Tr., ECF No. 65.  Damon Taaffe, Kevin Dinan, Carol Clayton, John

28  Matson and Mark Koehn appeared for FERC.  Paul Pantano, Thomas Millar, Stephanie Miner,

1    Kevin Clark and Ernie Kohnke appeared for Vitol.  Charles Mills and Karen Bruni appeared for

2    Corteggiano.  P. Todd Mullins appeared for amici EEI, EPSA and ETI.  At hearing, FERC relied

3    on *Ash Grove Cement Co. v. F.T.C.,* 577 F.2d 1368 (9th Cir. 1978), which it had not previously

4    cited in its briefs, so the court permitted the defendants to respond in a supplemental filing, which

5    they have done.  *See* Hr'g Tr. at 38:20–23; Resp. Suppl. Auth., ECF No. 67.  The court has

6    considered the supplemental briefing, but finds the *Ash Grove Cement* case inapplicable to the

7    questions resolved by this order, without the need for further discussion.

8                    **A.      Personal Jurisdiction, Venue and Individual Liability**

9           The court begins with Corteggiano's arguments that he is not subject to this court's

10   exercise of personal jurisdiction, that this District is an improper venue and that FERC cannot

11   assess civil penalties for market manipulation against natural persons.

12          "For a court to exercise personal jurisdiction over a defendant, there must be an

13   'applicable rule or statute [that] potentially confers jurisdiction over the defendant.'"  *Action*

14   *Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1177 (9th Cir. 2004) (alterations in

15   original) (quoting *Amba Mktg. Sys., Inc. v. Jobar Int'l, Inc.*, 551 F.2d 784, 787 (9th Cir. 1977)).

16   "Further, '[a] federal court obtains personal jurisdiction over a defendant if it is able to serve

17   process on him."  *Id.* (alterations in original) (quoting *Butcher's Union Loc. No. 498, United*

18   *Food & Com. Workers v. SDC Inv., Inc.*, 788 F.2d 535, 538 (9th Cir. 1986)); *see also* Fed. R. Civ.

19   P. 4(k)(1)(C).  "A statutory basis for exercising personal jurisdiction may be found in a statute

20   providing for service of process."  *Action Embroidery*, 368 F.3d at 1177.  The FPA includes such

21   a provision.  *See* 16 U.S.C § 825p.  And in this Circuit, if a federal statute permits nationwide

22   service of process, federal courts have personal jurisdiction over parties with sufficient contacts

23   with the United States as a whole, regardless of whether venue is proper in the particular district.

24   *See id.* at 1179–80; *Sec. Investor Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985).

25   This court therefore has personal jurisdiction over the claims against Corteggiano.

26          Corteggiano contends, contrary to *Action Embroidery*, that proper venue is a prerequisite

27   to this court's exercise of personal jurisdiction under the FPA.  *See* Corteggiano Mot. at 22–23.

28   The Ninth Circuit's decision in *Action Embroidery* is binding and rests on reasoning that applies

12

1    equally here.  "It has long been recognized that the question of a federal court's competence to

2    exercise personal jurisdiction over a defendant is distinct from the question of whether venue is

3    proper."  368 F.3d at 1178–79.  "Without a clear indication from Congress that it intended" to

4    "blur the basic, historic difference between these discrete concepts and what is required for their

5    satisfaction," *id.* at 1179, this court will not do so.  In any event, the court also finds that venue is

6    appropriate in this District as explained below.

7            Venue in a case seeking to confirm fines or penalties under the FPA is proper in a district

8    where the defendant resides or where "any act or transaction constituting the violation occurred."

9    16 U.S.C. § 825p.  Although Corteggiano is not a resident of this District, the trades described in

10   FERC's complaint all concerned power transmission within this District.  *See* Compl. ¶ 9.

11   According to the complaint, Corteggiano conceived of and orchestrated the scheme that sent

12   power over an intertie located within this District's boundaries, and FERC alleges Corteggiano's

13   goal was to manipulate wholesale power prices within this District.  *See* Compl. ¶¶ 51, 57, 59,

14   66–73.  These allegations support this District as an appropriate venue.  *See, e.g.*, *Fed. Energy*

15   *Regul. Comm'n v. Barclays Bank PLC* (*Barclays I*), 105 F. Supp. 3d 1121, 1134–36 (E.D. Cal.

16   2015) (finding venue appropriate in this District given "FERC's position that the conduct . . .

17   involved [the defendants'] transactions at California wholesale electricity prices," which in turn

18   caused "utilities, generators, other power marketers, or individual traders in California and this

19   District" to make "transactions according to those prices").

20           Corteggiano also argues natural persons are not subject to liability under the FPA's

21   antimanipulation rules.  *See* Corteggiano MTD at 28.  Other courts have rejected this argument

22   based on the wording of the statute and their reasoning is persuasive.  *See, e.g.*, *FERC v.*

23   *Coaltrain Energy, L.P.*, No. 16-732, 2018 WL 7892222, at *9–10 (S.D. Ohio Mar. 30, 2018)

24   (reviewing rationale and collecting authority).  For example, the FPA itself uses the word "entity"

25   in referencing natural persons, *id.* (focusing on text of 18 U.S.C. § 824(f) and § 824v(a) read in

26   concert, as well as §§ 824*o*-1(b)(3)-(4), 824u, 824k(h)), and FERC has interpreted the term

27   "entity" "'to include any person or form of organization, regardless of its legal status, function or

28   activities,'" *id.* at *10 (quoting 114 FERC 61,047, at **6 ¶ 18 (2006); finding FERC's

13

1    interpretation warrants *Chevron*[5] deference).  As a natural person, Corteggiano is subject to

2    liability under the FPA.

3              **B.      Statute of Limitations**

4              Vitol next argues FERC's complaint was filed after the statutory limitations period had

5    expired.  Vitol Mot. at 13–25.  A claim may be dismissed under Rule 12(b)(6) if it is "apparent on

6    the face of the complaint" that the relevant statute of limitations bars the claim.  *Huynh v. Chase*

7    *Manhattan Bank*, 465 F.3d 992, 997 (9th Cir. 2006) (quoting *Von Saher v. Norton Simon Museum*

8    *of Art at Pasadena*, 592 F.3d 954, 969 (9th Cir. 2010)).

9              Although the parties advance starkly different interpretations of the relevant statutory and

10   regulatory landscape, they agree FERC's enforcement actions are subject to a five-year statutory

11   limitations period beginning at the time a claim accrues, *see* Vitol Mot. at 13; Opp'n at 18; they

12   also agree the parties extended that period by one year, *see* Vitol Mot. at 2; Opp'n at 4; and no

13   one disputes the timeline alleged in FERC's complaint:

| | |
|---|---|
| October 25 & 28, 2013 | Vitol submitted the allegedly manipulative bids.  Compl. ¶¶ 58–59. |
| December 16, 2013 | FERC's Enforcement Office received information about the trades from a confidential source.  *Id.* ¶ 28.  FERC began investigating.  *See id.* |
| December 12, 2016 | The Enforcement Office sent a letter to Vitol and Corteggiano to inform them of its preliminary findings.  *Id.* ¶ 29. |
| March 8, 2017 | Vitol and Corteggiano sent a joint response to the preliminary findings.  *Id.*  FERC investigated further.  *Id.* ¶ 30. |
| June 7, 2017 | Vitol and Corteggiano sent a further joint response.  *Id.* |
| June 20, 2017 | The parties agreed to toll the five year limitations period for FERC to issue an order to show cause for one year.  *Id.* ¶ 43. |
| June 22, 2018 | The Enforcement Office told Vitol and Corteggiano that it intended to begin a public enforcement action.  *Id.* ¶ 33. |
| August 10, 2018 | Vitol and Corteggiano sent a joint response.  *Id.* |
| December 18, 2018 | Vitol and Corteggiano revised their joint response.  *Id.* |

---

[5]  *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).

14

| | |
|---|---|
| April 4, 2019 | Vitol and Corteggiano updated their revised joint response. *Id.* |
| July 10, 2019 | FERC issued an order to show cause to Vitol and Corteggiano, including proposed penalties of $6,000,000 and $800,000, respectively. *Id.* ¶¶ 12, 35. |
| July 24, 2019 | Vitol and Corteggiano asked for a four-week extension of the 30-day deadline to respond to the order to show cause. *Id.* ¶ 38. |
| August 5, 2019 | FERC granted Vitol and Corteggiano a two week extension. *Id.* |
| August 23, 2019 | Vitol and Corteggiano filed a joint answer to the order to show cause, electing the "alternate" option under 16 U.S.C. § 823b(d)(3). *Id.* ¶¶ 3, 40. |
| October 25, 2019 | FERC determined that Vitol and Corteggiano had violated section 222(a) and assessed penalties under 16 U.S.C. § 823b(d)(3)(A). *Id.* ¶ 41. |
| December 25, 2019 | The parties agreed to toll the limitations period for filing a district court case between this date and January 8, 2020. *Id.* ¶ 44. |
| January 6, 2020 | FERC filed its complaint in this case. *See generally id.* |

### 1.    28 U.S.C. § 2462

The limitations period for the commencement of FERC proceedings is prescribed in 28 U.S.C. § 2462.  Under that section, unless another statute provides otherwise, "an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued."  28 U.S.C. § 2462.  To determine whether FERC's complaint was timely under that section, then, the court must identify the "action, suit or proceeding," "the claim," and the date that claim "first accrued."  To do so the court first interprets the language of the statute based on a plain reading while noting other courts' interpretations as relevant.  The court also addresses defendants' arguments in testing its conclusions.

#### a)    Statutory Interpretation

##### i.    "Action, Suit or Proceeding"

The court begins with what is an "action, suit or proceeding" and what is not.  Other courts have reached two conflicting interpretations.  One, as Vitol argues, there is just one

"action"—the civil action FERC filed in this court.  *See* Vitol Mot. at 14, 19–24.  That is the interpretation another judge of this court adopted in *Federal Energy Regulatory Commission v. Barclays Bank PLC* (*Barclays II*), No. 13-02093, 2017 WL 4340258, at \*10–13 (E.D. Cal. Sept. 29, 2017).  *See also United States v. Core Labs., Inc.*, 759 F.2d 480 (5th Cir. 1985) (reasoning similarly in another statutory context).  Two, as FERC contends, there is a second "action, suit or proceeding" that can trigger the statute of limitations, namely the proceeding that begins with FERC's issuance of an order to show cause.  *See* Opp'n at 7–13.  The Fourth Circuit and two district courts within the First Circuit have adopted this interpretation.  *See Powhatan*, 949 F.3d at 904; *Fed. Energy Reg. Comm'n v. Silkman* (*Silkman II*), 359 F. Supp. 3d 66 (D. Me. 2019); *Fed. Energy Reg. Comm'n v. Silkman* (*Silkman I*), 177 F. Supp. 3d 683 (D. Mass. 2016); *see also United States v. Meyer*, 808 F.2d 912 (1st Cir. 1987) (reasoning similarly in another statutory context).

Courts appear to agree that for a process to qualify as a "proceeding," the moniker most applicable to an administrative matter, it must include "some adversarial adjudication, be it administrative or judicial."  *Capozzi v. United States*, 980 F.2d 872, 874 (2d Cir. 1992) (emphasis omitted); *see also Powhatan*, 949 F.3d at 902; *Barclays II*, 2017 WL 4340258, at \*11; *Silkman II*, 359 F. Supp. 3d at 121–22; *Silkman I*, 177 F. Supp. 3d at 700.  Courts disagree regarding whether the administrative enforcement process provided by the FPA can be a "proceeding."  Those on which the defense relies have found that the Act's administrative process is nonadversarial and nonadjudicatory and akin to a prosecutor's grand jury presentation or charging letter.  *See, e.g., Silkman II,* 359 F. Supp. 3d at 121–22; Vitol Mot. at 20.  Vitol emphasizes the absence of discovery and hearings, and the unavailability of cross-examination and presentation of expert testimony if a party elects the "alternate" option, *see* Vitol Mot. at 20; *see also Silkman I*, 177 F. Supp. 3d at 700.  Other courts acknowledge the regulatory process here is "less formal" than a judicial action and offers fewer "procedural protections," but find it "significantly" more adversarial and adjudicative than a unilateral, discretionary decision to prosecute or impose a fine. *See Powhatan*, 949 F.3d at 902; *Barclays II*, 2017 WL 4340258, at \*12.

1         To fairly assess whether the FERC administrative process is a "proceeding," the court

2  takes account of its uniquely diverging structure as established by statute and regulation:

3  depending on the alleged violator's response to a FERC investigation, the process may be

4  adversarial and adjudicatory or perfunctory and prosecutorial.  *See generally* 16 U.S.C. § 823b;

5  18 C.F.R. §§ 385.1501-385.1511.

6         If the alleged violator does nothing in response to an order to show cause, and thus

7  submits to the "default" process, that process takes an adjudicatory path.  As one court explains,

8  "[t]he FERC Commissioners act as neutral decisionmakers, while FERC Enforcement staff

9  present the factual and legal bases supporting imposition of a civil penalty."  *Powhatan*, 949 F.3d

10  at 902 (citing 18 C.F.R. §§ 385.2201 & 385.2202).  Also, "FERC's ex-parte communications rule

11  applies, prohibiting 'any off-the-record communications between (i) Commissioners and the staff

12  that may advise them (decisional staff) and (ii) Enforcement prosecutorial staff involved in the

13  investigation or show cause proceeding.'"  *Id.* (quoting *Silkman II*, 359 F. Supp. 3d at 99); *see*

14  *also* 18 C.F.R. § 385.2201(c)(1)(i).  The FERC enforcement staff and the alleged violator "submit

15  formal briefing and relevant documentary evidence to FERC, which then determines whether to

16  impose civil penalties."  *Id.* (citing *Silkman II*, 259 F. Supp. 3d at 100, 106).  Even those who

17  question the "adjudicatory" nature of this enforcement path describe this "default" process as "an

18  adjudication" and "'agency proceeding.'"  *See Barclays II*, 2017 WL 4340258, at *7 (quoting

19  *FERC v. City Power Mktg., LLC*, 199 F. Supp. 3d 218, 230 (D.D.C. 2016)); *see also* Vitol Mot. at

20  18 n.14 ("If the respondent does not make an election to adjudicate FERC's Liability Claim under

21  the Federal Civil Action option within 30 days of the notice, FERC's Liability Claim by default

22  will be adjudicated in an evidentiary, on-the-record hearing before an Administrative Law Judge

23  that affords respondents full discovery and procedural due process rights.").

24         If, by contrast, the alleged violator elects the "alternate" option, as Vitol and Corteggiano

25  did here, the process is truncated, no hearing takes place and FERC assesses a penalty.  *See*

26  16 U.S.C. § 823b(d)(3).  "[N]othing in the statute" requires that this determination follow "a

27  neutral adjudicative decision-making process."  *Barclays II*, 2017 WL 4340258, at *14 (citation

28  omitted).  It "is simply a mechanism for getting the case into district court."  *Id.* (citation

1    omitted).  The process bears little resemblance to an adjudication until FERC begins an

2    enforcement action in a federal district court.  *Cf. City Power*, 199 F. Supp. 3d at 232 (treating

3    action for de novo review in federal district court "like a normal civil action governed by the

4    Federal Rules").

5         By its express terms, the FPA creates both processes and gives an alleged violator its

6    choice between them.  FERC cannot know which path a matter will take until the alleged violator

7    decides.  In *Silkman II*, the district court observed an alleged violator has only itself to blame if it

8    receives no hearing before an administrative law judge and if, instead of a hearing, FERC simply

9    assesses a penalty under the "alternate" option.  *See* 359 F. Supp. 3d at 122 n.133.  Alleged

10   violators may in fact prefer to avoid a hearing before an administrative law judge.  And according

11   to the amici here, the majority of alleged violators in fact take the alternate path.  *See* Amicus Br.

12   at 13–14.

13        And that is the decisive fact: FERC acts most like a prosecutor and least like an

14   adjudicator when an alleged violator affirmatively requests it to do so.  *See* 16 U.S.C.

15   § 823b(d)(3).  Because an alleged violator can pursue an adjudicatory hearing if it chooses, the

16   court finds the enforcement process that begins with FERC's issuance of an order to show cause

17   and terminates with the assessment of a penalty is a "proceeding for the enforcement of a civil

18   fine, penalty or forfeiture" under 28 U.S.C. § 2462.  A rough analogy to default judgment in a

19   civil case illustrates the point: after receiving service of a complaint, a defendant may appear,

20   respond to the allegations against it, and defend itself vigorously; or alternatively it may ignore

21   the complaint and wait for the plaintiff to obtain and attempt to enforce a default judgment.  The

22   option to forgo litigation does not make a civil case any less of an adjudicatory "action" or "suit."

23   Neither does an alleged violator's choice to forgo an administrative hearing strip the regulatory

24   process of its adjudicatory and adversarial character.  The administrative process here is a

25   "proceeding," initiated by FERC's issuance of an order to show cause.

26                        **ii.      "Claim"**

27        The next task is to identify "the claim" that accrues for this "proceeding."  The D.C.

28   Circuit offers a persuasive insight in *3M Co. v. Browner*, 17 F.3d 1453 (D.C. Cir. 1994).  In that

1    case, an administrative law judge had held that the five-year limitations period of § 2462 applied

2    only to the commencement of judicial proceedings, not administrative proceedings. *See id.* at

3    1455.  The D.C. Circuit disagreed, finding as this court has above that the five-year limitations

4    period applied to both, including in particular the administrative proceeding because it was an

5    "action, suit or proceeding" under § 2462. *See id.* at 1455–57.  The court then had to decide

6    whether that administrative "action, suit or proceeding" was "for the enforcement of" a civil

7    penalty and found it was. *See id.* at 1457.  In so finding, the court looked for guidance to a prior

8    version of § 2462, which used different language but had the same meaning. *See id.* at 1458; *see*

9    *also, e.g.*, *Gabelli v. S.E.C.*, 568 U.S. 442, 448 (2013) (interpreting modern text of § 2462 by

10   reference to its predecessors).  Specifically, the prior version of § 2462 did not use the word

11   "enforcement" at all.  Instead, it provided that "[n]o suit or prosecution for any penalty or

12   forfeiture" could be maintained unless brought within five years. *Id.* (citation omitted).  For the

13   D.C. Circuit, a reading of these two versions of § 2462 resolved the question.  The phrase in the

14   modern statute -- "for the enforcement of a penalty" -- did not mean anything different than the

15   simpler phrase in the previous statute — "for any penalty"—; a procedure aiming to assess or

16   impose a penalty was indisputably a proceeding "for a penalty," so it was in the updated

17   terminology a procedure to "enforce" a penalty. *See id.* at 1458–59 & n.7.

18       A similar comparison between the current text of § 2462 and its predecessor also sheds

19   light on the definition of "claim."  Just as the previous version of § 2462 did not refer to the

20   "enforcement" of a penalty, it did not refer to any "claim." *See id.* at 1458 n.7 (quoting previous

21   text).  Under the previous version of § 2462, a "penalty" or "forfeiture" accrued, not a claim. *See*

22   *id.*  Again, because the modern and previous versions of § 2462 have the same meaning, the

23   "claim" that accrues under § 2462 is synonymous with "fine, penalty, or forfeiture."  The basis

24   for the penalty FERC pursues against Vitol and Corteggiano is the bid activity in October 2013.

25   The claim seeking the penalty was, in the first instance, included in the order to show cause

26   FERC issued in July 2019.  Having then assessed penalties against defendants in October 2019,

27   FERC filed the instant complaint in this court to enforce its manipulation claims against

28   defendants, which also are claims contemplated by § 2462. *See generally* Compl. ¶¶ 79-80

19

("claim" FERC asserts in this action is the unpaid civil penalty); *see also 3M Co.,* 17 F.3d at 1459 ("Applying the five-year limitations period to administrative proceedings in which liability is determined and a penalty imposed, does not preclude also applying § 2462 to later collection actions in district court . . . .").

###           iii.        When Does Claim "Accrue"

The question remains, then, when the claim for the civil penalty accrued.  An action cannot "accrue" as contemplated by the terms of § 2462 until a plaintiff has a "complete and present cause of action."  *Gabelli*, 568 U.S. at 448.

The Supreme Court in *Crown Coat Front Co. v. United States*, 386 U.S. 503 (1967) addressed when a claim submitted to a regulatory process accrues.  In *Crown Coat*, a contractor disputed a price reduction the government had imposed on a canteen contract.  *See id.* at 508. Under the contract, an executive officer would first review that claim, and a regulatory board could then entertain an appeal.  *Id.* at 505.  The officer denied the contractor's claim, and the board affirmed.  *Id.* at 508.  The contractor then challenged the regulatory decision in federal district court.  *Id.* at 507.  The applicable statute of limitations was set forth in 28 U.S.C. § 2401(a), providing that "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues."  *Id*.  The district court decided the claim was untimely because the claim had accrued when the contract had been completed more than six years before, longer than the relevant limitations period, and the appeals court affirmed.  *See id.* at 507, 514.  The Supreme Court disagreed.  *See id.* at 522.  It held that the claim in question had "first accrued . . . upon the completion of the administrative proceedings contemplated and required by the provisions of the contract."  *Id.* at 510.  The plaintiff could not have filed his district court complaint before the administrative decision was final.  *See id.* at 512, 514.

The First Circuit's opinion in *United States v. Meyer, supra,* applied *Crown Coat* in determining when a claim accrued in a case involving a statute of limitations mirroring § 2462. 808 F.2d at 916 (statute provided that civil action "shall be barred unless the complaint is filed within six years after the right of action first accrues . . . " 28 U.S.C. § 2401(a)).  In *Meyer*, the

20

Department of Commerce had pursued an administrative enforcement action under the Export Administration Act. *See Meyer,* 808 F.2d at 913. After several years of "skirmishing," an administrative law judge imposed a civil penalty. *Id.* The defendant did not pay, so the Department of Commerce sued in federal court to enforce the penalty. *Id.* More than five years had passed since the alleged violations, but less than five years had passed since the penalty was assessed. *Id.* The First Circuit held the district court case was timely filed based on its reading of statute's "unambiguous language": "[A] claim for 'enforcement' of an administrative penalty," it held, "cannot possibly 'accrue' until there is a penalty to be enforced." *Id.* at 914; *see also id.* at 922.

As signalled above, a number of federal appellate courts other than the Ninth Circuit have reached the same conclusion with respect to § 2462 specifically. *See*, *e.g.*, *Powhatan*, 949 F.3d at 898–99 ("Only upon satisfaction of [the requirements in § 823b(d)] did Congress direct that FERC 'shall institute an action' in federal district court. And only then did § 2462's statutory limitations period for filing suit commence."); *see also S.E.C. v. Mohn*, 465 F.3d 647, 654 (6th Cir. 2006) ("The parties agree that a claim accrues . . . on any collection proceeding to which § 2462 applies once the underlying administrative action establishing liability becomes final."); *United States v. Godbout-Bandal*, 232 F.3d 637, 640 (8th Cir. 2000) ("[W]here an Act which authorizes the assessment of a civil penalty also provides for an administrative procedure for assessing that penalty, the statute of limitations period set out in § 2462 will not begin to run until that administrative process has resulted in a final determination."); *compare U.S. Dep't of Lab. v. Old Ben Coal Co.*, 676 F.2d 259, 261 (7th Cir. 1982) ("In the context of the [Federal Coal Mine Health and Safety Act of 1969] the district court claim accrues only after the administrative proceeding has ended, a penalty has been assessed, and the violator has failed to pay the penalty."); *Lins v. United States*, 688 F.2d 784, 786 (Ct. Cl. 1982) ("If disputes are subject to mandatory administrative proceedings, then the claim does not accrue until their conclusion.").

Of those to address the question, only the Fifth Circuit has disagreed. *See United States v. Core Labs., Inc.*, 759 F.2d 480 (5th Cir. 1985). In *Core Labs.*, the Fifth Circuit distinguished *Crown Coat* by noting the Supreme Court in that case was interpreting and applying a statute of

1     limitations other than that provided in § 2462; it also cited the *Crown Coat* decision's caution

2     against generalizing the definition of "accrual" without attention to the statutory context and

3     practical consequences. *See id.* at 481-82.  In finding a claim "accrues at the time of the

4     underlying violation," *id.* at 483, the Fifth Circuit invoked a particular concern about a party's

5     "right to be free of stale claims," *id.* at 483, given the government's control of "[t]he progress of

6     administrative proceedings," *id.* at 482.  Other courts have declined to follow *Core Labs.* in

7     reasoned decisions, including the First Circuit in *Meyer*.  *See Meyer*, 808 F.2d at 915–16, 920–21;

8     *see also, e.g.*, *United States v. Worldwide Indus. Enters., Inc.*, 220 F. Supp. 3d 335, 339–46

9     (E.D.N.Y. 2016) (summarizing split thoroughly and declining to follow *Core Labs.*).  The court

10    in *Meyer* discounted staleness as a concern, observing any "footdragging" by the government

11    "would tend to reduce the [] chances of proving its case and collecting monetary sanctions."

12    *Meyer*, 808 F.2d at 922.

13            While the Ninth Circuit has not addressed the question of when a claim accrues as

14    relevant here, it has agreed in principle with the majority view summarized above.  *See DLS*

15    *Precision Fab LLC v. U.S. Immigr. & Customs Enf't*, 867 F.3d 1079, 1086 (9th Cir. 2017) (per

16    curiam).  In *DLS*, the Ninth Circuit was asked to review an Administrative Law Judge's finding

17    that DSL was liable to pay civil penalties for numerous violations of section 274A(b) of the

18    Immigration and Nationality Act (INA), which requires employers to verify that their employees

19    are legally authorized to work in the United States.  *See id*. at 1085.  Specifically, the Ninth

20    Circuit was asked to pass on the "timeliness of the administrative proceeding [under § 2462] that

21    imposed the penalty in the first place."  *Id.*  In doing so, it distinguished cases including *Meyer*,

22    which addressed a "separate judicial action to enforce a penalty imposed in an earlier

23    administrative suit."  *Id.* (citing *Mohn*, 465 F.3d at 653–64; *Godbout–Bandal*, 232 F.3d at 639–

24    40; *Meyer*, 808 F.2d at 922).  But the Circuit agreed that "the language of § 2462 speaks directly

25    to establish the limitations period for filing an action to collect a previously imposed penalty."  *Id.*

26    "[T]he limitations period for a subsequent penalty enforcement claim does not begin until the

27    penalty has been imposed," *id.*, which in other words is when the claim accrues.

1    Taking account of the decision in *DLS*, this court is persuaded ultimately by *Meyer*,

2  *Powhatan* and the other like-minded decisions reviewed above that its understanding of when a

3  claim accrues is correct.  The rule derived from these cases arguably is binding under *Crown*

4  *Coat*.  But even if it is not, the majority rule is most persuasively reasoned.  An action cannot

5  "accrue" as contemplated by the terms of § 2462 until a plaintiff has a "complete and present

6  cause of action."  *Gabelli*, 568 U.S. at 448.  FERC can have no "complete and present cause of

7  action" seeking review or affirmation of a civil fine under the FPA until FERC has first assessed

8  that fine through its administrative process.

9    As the court in *Meyer* trenchantly pointed out, a contrary conclusion would permit

10 individuals to misuse the statute of limitations:

11      [The government] would have a total of five years from the date of a
12      statutory violation within which to uncover the infraction, conduct
13      the necessary investigation, issue a charging letter, and wend its way
14      through the (often lengthy) administrative process.  A suspected
15      violator would . . . have considerable incentive to employ the
16      available procedures to work delay—not a particularly difficult task
17      in view of the marked resemblance between the conduct of modern
18      administrative litigation and King Minos's labyrinth in ancient Crete.

19 *Meyer*, 808 F.2d at 920.  Or as the Supreme Court observed in *Crown Coat*, from the point of

20 view of a party opposing the government:

21      The [plaintiff] is compelled to resort to administrative proceedings
22      which may be protracted and which may last not only beyond the
23      completion of the contract but continue for more than [the limitations
24      period].  If the time bar starts running from the completion date, the
25      contractor could thus be barred from the courts by the time his
26      administrative appeal is finally decided.  This would be true whether
27      he wins or loses [in the administrative proceedings].  Even if he
28      prevailed there and was granted the equitable adjustment he sought,
29      the [defendant] would be immune from suit to enforce the award if
30      more than six years had passed since the completion of the contract.

31 386 U.S. at 514.

32    FERC's "claim" that it pursued in the regulatory process accrued in October 2013, when

33 the grounds for issuing an order to show cause had crystallized.  But its claim in the complaint

23

1    before this court "first accrued" when FERC's administrative process was complete on October

2    25, 2019.

3                            iv.     **Counterarguments by Defendants**

4             The defendants and amici advance several counterarguments, but none is persuasive.

5    First, Vitol argues that under *Gabelli*, all actions to enforce civil fines or penalties must be filed

6    within five years of the allegedly wrongful conduct. *See* Vitol Mot. at 14–17 (citing 568 U.S.

7    442). As discussed above, the enforcing agency in *Gabelli* was the Securities and Exchange

8    Commission and, unlike FERC, it could file its claim in a district court without first completing

9    any administrative process. *See* 568 U.S. at 445 (citing 15 U.S.C. § 80b-9(d)).[6]

10            Vitol would also distinguish this case from *Meyer* and the other federal decisions cited

11   above by arguing these cases "involved an administrative adjudication on the merits and a final

12   judgment followed by a collection or similar action." Vitol Reply at 8 (emphasis omitted). As

13   discussed above, that is a distinction of Vitol's own creation. FERC proposed a penalty and

14   offered an adversarial adjudication before an administrative law judge, but Vitol declined. *See*

15   *Silkman II*, 259 F. Supp. 3d at 121–22 n.133 (reasoning similarly).

16            Vitol also argues briefly in the margin of its reply that this court should not follow *Crown*

17   *Coat*. *See* Reply at 7 n.10. In the same footnote, Vitol mentions that the contractor plaintiff in

18   *Crown Coat* was not entitled to de novo review of its claim. *See* Vitol Reply at 7 n.10; 386 U.S.

19   at 512–13. Under the FPA, by contrast, a federal district court does conduct a de novo review

20   when an alleged violator elects the alternate option. *See* 16 U.S.C. § 823b(d)(3)(B). Vitol does

21   not explain why that distinction would lead to a different result in this case. It does not. No

22   matter what standard of review a federal court must use, no "review" is possible without a

_____

[6] "Whenever it shall appear to the Commission that any person has engaged, is engaged, or is about to engage in any act or practice constituting a violation of any provision of this subchapter, or of any rule, regulation, or order hereunder, or that any person has aided, abetted, counseled, commanded, induced, or procured, is aiding, abetting, counseling, commanding, inducing, or procuring, or is about to aid, abet, counsel, command, induce, or procure such a violation, it may in its discretion bring an action in the proper district court of the United States, or the proper United States court of any Territory or other place subject to the jurisdiction of the United States, to enjoin such acts or practices and to enforce compliance with this subchapter or any rule, regulation, or order hereunder." 15 U.S.C. § 80b-9(d).

1   decision to review.  Because FERC cannot have filed this case before the administrative process

2   was complete, Vitol's argument amounts to one of two possible positions: (1) FERC was required

3   to file a protective action in federal district court while the administrative process wound its way

4   to completion, or (2) FERC was required to begin the administrative process soon enough to

5   guarantee it could file a judicial complaint in time.  The Supreme Court rejected the first position

6   expressly in *Crown Coat*.  *See* 386 U.S. at 521 ("Since it would remain quiescent until the

7   administrative decision is rendered, the protective suit would be a sheer formality in any event—a

8   procedural trap for the unwary and an additional complication for those who manage the dockets

9   of the courts.").  And the Court rejected the second position by unambiguous implication.  *See id.*

10   at 514 (rejecting the government's position that the claim accrued before the administrative

11   process began because if it did, then the aggrieved contractor could "be barred from the courts by

12   the time his administrative appeal is finally decided").

13         Vitol and the amici also argue FERC's interpretation of § 2462 would permit the same

14   claim to accrue twice.  *See* Vitol Mot. at 22–24; Vitol Reply at 7–8; Amicus Br. at 4.  If it did,

15   Vitol and the amici argue, then FERC would have two five-year limitations periods to pursue the

16   same claim, a novel result that Congress could not have intended.  *See id.*  The court disagrees.

17   To start, this result is not novel.  As summarized above, since the 1980s, federal courts have

18   recognized that a statute of limitations might set the same cut-off for initiating an action that

19   applies at two points in the process, first administratively and then to the initiation of a judicial

20   enforcement action.  Nor is FERC pursuing the same "claim" twice.  It is pursuing two different

21   claims, both expressly created by statute: one seeking to assess a proposed civil penalty,

22   16 U.S.C. § 823b(d)(1), (d)(3)(A), and the other to review and affirm that penalty, *id.*

23   § 823b(d)(3)(B).  Congress passed § 823b(d) after § 2462 and its predecessors had been on the

24   books for more than a hundred years.  *See* Electric Consumers Protection Act of 1986 § 12, Pub.

25   L. 99-495, 100 Stat. 1243 (Oct. 16, 1985).  Congress could have provided a distinct limitations

26   period for the two "actions, suits or proceedings" described in § 823b(d), particularly given that

27   this subsection indeed sets several specific deadlines.  But Congress did not create different

1    limitations periods and it is presumed to have acted with full knowledge of its options. *See*

2    *Gabelli*, 568 U.S. at 453.

3        Finally, defendants and amici decry FERC's interpretation as bad policy.  They argue

4    FERC should bear the risk that an alleged violator will elect the alternate process, and therefore

5    move more quickly.  *See, e.g.*, Vitol Reply at 3–4, 9; Amicus Br. at 4–9.  The court declines to

6    impose a restriction contrary to the unambiguous terms of § 823b(d) and § 2462.  If the FPA is

7    inefficient or creates too much uncertainty, or grants FERC too much time if an alleged violator

8    elects the alternate option, then the defendants and amici may elect the default administrative

9    hearing under the law as it stands, on a parallel track, and urge Congress to modify § 823b(d) and

10   § 2462.  Moreover, whether the current statute effects good policy is not for this court to decide.

11   After all, "courts aren't free to rewrite clear statutes under the banner of our own policy

12   concerns."  *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1815 (2019).

13                                    **v.    Conclusion**

14       In sum, FERC could not have entertained the regulatory process seeking to impose a civil

15   fine or penalty against Vitol and Corteggiano unless that process began within six years of their

16   allegedly manipulative trading, given the five-year statute of limitations plus one year extension

17   the parties agreed to, as discussed above.  The underlying trades were completed in late October

18   2013, and FERC began its proceeding by sending Vitol and Corteggiano an order to show cause

19   in July 2019, less than six years later.  FERC's regulatory proceedings seeking to assess a civil

20   fine were not time-barred.

21       Additionally, it is not "apparent on the face of the complaint" that the relevant statute of

22   limitations bars FERC's claim.  *Huynh*, 465 F.3d at 997 (quoting *Von Saher*, 592 F.3d at 969).

23   The motions to dismiss are denied to the extent they raise violations of the applicable statute of

24   limitations.  The court need not and does not decide whether the 60-day waiting period tolled the

25   statute of limitations, *see* Opp'n at 18–20 (citing 16 U.S.C. § 823b(d)(3)(B); noting period of time

26   FERC must give respondent to pay the civil penalty before filing its complaint in federal court),

27   or whether § 2462 applies to disgorgement claims, *see id.* at 20–22.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### C.    Violation of Antimanipulation Rule

Vitol and Corteggiano also argue FERC's complaint does not state a claim for manipulation under the FPA and move to dismiss based on Federal Rule of Civil Procedure 12(b)(6).

#### 1.    Rule 12(b)(6) Standard

Rule 12(b)(6) permits motions to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). The motion may be granted only if the complaint lacks a "cognizable legal theory" or if its factual allegations do not support a cognizable legal theory. *Hartmann v. Cal. Dep't of Corr. & Rehab.*, 707 F.3d 1114, 1122 (9th Cir. 2013). The court assumes all factual allegations are true and construes "them in the light most favorable to the nonmoving party." *Steinle v. City & Cty. of San Francisco*, 919 F.3d 1154, 1160 (9th Cir. 2019). If the complaint's allegations do not "plausibly give rise to an entitlement to relief," the motion must be granted. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

A complaint need ordinarily contain only a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), not "detailed factual allegations," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). But when a plaintiff asserts a fraud claim, the complaint "must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). Courts have evaluated manipulation claims under the FPA against this standard. *See, e.g.*, *Coaltrain*, 2018 WL 7892222, at *4; *Silkman I*, 177 F. Supp. 3d at 706–07.

"Particularity," as that word is used in Rule 9(b), means the complaint must explain the circumstances of the alleged fraud specifically enough to give the defendants "notice of the particular misconduct" so "they can defend against the charge and not just deny that they have done anything wrong." *Id.* at 1124 (quoting *Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001)). A common gloss on this standard explains that a complaint must detail "the who, what, when, where, and how" of the alleged fraud. *See, e.g.*, *Vess v. Ciba–Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (quoting *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997)). "Malice, intent, knowledge, and other conditions of a person's mind," by contrast, "may be alleged generally." Fed. R. Civ. P. 9(b).

### 2.     FPA's Antimanipulation Provision

FERC alleges Vitol and Corteggiano violated section 222(a) of the FPA, codified at 16 U.S.C. § 824v(a) as follows:

> It shall be unlawful for any entity . . . directly or indirectly, to use or employ, in connection with the purchase or sale of electric energy or the purchase or sale of transmission services subject to the jurisdiction of the Commission [i.e., FERC], any manipulative or deceptive device or contrivance (as those terms are used in section 10(b) of the Securities Exchange Act of 1934 . . . ), in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of electric ratepayers.

16 U.S.C. § 824v(a).  As authorized by this section, FERC has promulgated an anti-manipulation rule:

> (a) It shall be unlawful for any entity, directly or indirectly, in connection with the purchase or sale of electric energy or the purchase or sale of transmission services subject to the jurisdiction of the Commission,
>
> > (1) To use or employ any device, scheme, or artifice to defraud,
> >
> > (2) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> >
> > (3) To engage in any act, practice, or course of business that operates or would operate as a fraud or deceit upon any entity.

18 C.F.R. § 1c.2(a).

To properly understand the statutory antimanipulation provision, it helps to review its origins.  "Congress passed section 824v as part of the Energy Policy Act of 2005 in response to the 'Western Energy Crisis' of 2000 to 2001."  *FERC v. Powhatan Energy Fund, LLC*, 345 F. Supp. 3d 682, 688 n.9 (E.D. Va. 2018), *aff'd and remanded*, 949 F.3d 891 (4th Cir. 2020). That crisis arose after the deregulation and restructuring of California utilities in the 1990s, followed by abuses and manipulation by traders, spikes in energy prices, power outages, bankruptcies, and extensive litigation.  *See, e.g.*, *Pac. Gas & Elec. Co. v. FERC*, 464 F.3d 861,

1    863–66 (9th Cir. 2006); *California ex rel. Lockyer v. FERC*, 383 F.3d 1006, 1008–10 (9th Cir.

2    2004); *Enron Power Mktg., Inc., et al.*, 103 FERC ¶ 61343 (2003).  Section 824v is modeled on

3    section 10(b) of the Securities Exchange Act of 1934, and FERC's related rule is modeled on the

4    Securities and Exchange Commission's Rule 10b-5.  Section 10(b) and Rule 10b-5 prohibit

5    manipulative or deceptive devices or contrivances in securities markets.  *See* 15 U.S.C. § 78j(b);

6    17 C.F.R. § 240.10b-5(a).  For this reason, courts often have consulted the extensive case law

7    interpreting section 10(b) when faced with disputes about the interpretation of § 824v(a).  *See,*

8    *e.g.*, *City Power*, 199 F. Supp. 3d at 234; *Barclays I*, 105 F. Supp. 3d at 1146–47.

9         That case law is instructive here as well.  Private plaintiffs must normally prove six

10   elements to establish a violation of section 10(b).  *See Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d

11   931, 939 (9th Cir. 2009).  The government must normally prove only three in civil cases, and

12   those three elements can readily be adapted to FERC's claim here:

13        (1)    The defendants used or employed a manipulative or deceptive device or

14               contrivance;

15        (2)    The defendants acted with a wrongful state of mind, i.e., scienter; and

16        (3)    The defendants' actions were connected to the purchase or sale of electric energy

17               or the purchase or sale of transmission services subject to FERC's jurisdiction.

18   *See United States v. Vilar*, 729 F.3d 62, 88 (2d Cir. 2013);[7] *see also* Vitol Mot. at 27 (agreeing

19   these are elements of claim for manipulation under FPA); Opp'n at 23–37 (arguing Complaint

20   satisfies these elements).  Here, the parties do not dispute the third element, that the allegedly

21   manipulative and deceptive power trading was connected to the purchase and sale of electric

22   energy and subject to FERC's jurisdiction.  They dispute only whether FERC's allegations permit

23   a plausible inference that Vitol and Corteggiano used a manipulative or deceptive device or

24   contrivance and whether these defendants acted with scienter.

---

[7] Only the third element is different here; in securities cases, the government must prove the defendant's actions were "in connection with the purchase or sale of a security."  *Id.* (quoting *VanCook v. S.E.C.*, 653 F.3d 130, 138 (2d Cir. 2011)).

1        Cases interpreting section 10(b) and Rule 10b-5 again offer helpful guidance, for the

2  court's analysis.  Courts have often emphasized that section 10(b) "was designed as a catch-all

3  clause" to prevent a wide variety of fraudulent practices.  *Chiarella v. United States*,

4  445 U.S. 222, 226 (1980).  The Supreme Court thus has interpreted the section and rule

5  "flexibly," not "technically and restrictively."  *S.E.C. v. Zandford*, 535 U.S. 813, 819 (2002)

6  (quoting *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 151 (1972)).  So read, the

7  statute prohibits both "garden variety" frauds and novel frauds.  *Arrington v. Merrill Lynch,*

8  *Pierce, Fenner & Smith, Inc.*, 651 F.2d 615, 619 (9th Cir. 1981) (quoting *Superintendent of Ins. v.*

9  *Bankers Life and Cas. Co.*, 404 U.S. 6, 10 n.7 (1971)).  In applying this flexible approach to

10  section 10(b) itself, the Supreme Court has held, for example, that both silence and affirmative

11  conduct, alone, may be fraudulent or deceptive.  *See Stoneridge Inv. Partners, LLC v. Sci.-*

12  *Atlanta*, 552 U.S. 148, 158 (2008); *Chiarella*, 445 U.S. at 230.

13        Lower courts also have held that facially legitimate trades might be "manipulative" under

14  section 10(b) if those trades were intended to deceive.  Suppose, for example, that a firm

15  underwrites an initial public offering of securities.  Then, after shares hit the markets, the

16  underwriter dominates the market for the newly offered securities, maintains bid prices above

17  prevailing market prices, and absorbs any unwanted shares into its inventory, all in an attempt to

18  falsely portray the security as stable and valuable.  Even if every one of these trades were facially

19  legitimate and actually fulfilled, the overall scheme might be deceptive, and thus violate section

20  10(b), "solely because of the actor's purpose."  *See Markowski v. S.E.C.*, 274 F.3d 525, 528, 529

21  (D.C. Cir. 2001) (finding this interpretation of 10(b) reasonable under *Chevron U.S.A., Inc. v.*

22  *Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843–44 (1984)); *see also, e.g.*, *Koch v.*

23  *S.E.C.*, 793 F.3d 147, 154–16 (D.C. Cir. 2015) (holding that buying and selling stock at end of

24  trading day in attempt to artificially inflate stock's value would violate section 10(b)).  Or

25  suppose an investor buys and sells stock at a loss in an attempt to influence the prices of

26  corresponding options contracts, and then trades the stock for a profit.  This would be

27  manipulative even if the stock transactions were "real" and facially legitimate.  *See S.E.C. v. Lek*

28  *Sec. Corp.*, 276 F. Supp. 3d 49, 56, 64 (S.D.N.Y. 2017) (denying motion to dismiss manipulation

claims based on such allegations).  Even unsuccessful attempts to manipulate a market might run

afoul of section 10(b) if motivated by a deceptive intent.  *See Koch*, 793 F.3d at 155 (declining to

require "market impact").  Intent may be "the only factor that distinguishes legitimate trading

from improper manipulation."  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 102

(2d Cir. 2007).

Federal district courts have carried these principles over to energy markets and the FPA's

anti-manipulation provision.  *See, e.g.*, *Coaltrain*, 2018 WL 7892222, at *11; *City Power*,

199 F. Supp. 3d at 234–35; *Barclays I*, 105 F. Supp. 3d at 1147.  In *Coaltrain*, the defendants had

bought and sold financial products that permitted traders to earn profits by correctly predicting

transmission costs at different trading nodes.  *See* 2018 WL 7892222, at *2.  If used correctly,

these products would permit price arbitrage.  *Id.*  FERC alleged in a complaint filed in federal

district court that the defendants had not intended to earn money by correctly predicting price

differences.  *Id.*  They had not made any profits at all.  *Id.*  Instead, according to FERC, the

defendants had made many useless trades in an attempt to pump up their trading volume and

inflate payouts tied to that trading volume.  *Id.*  After reviewing cases interpreting section 10(b),

the district court found for purposes of pleading a claim that the alleged scheme was

manipulative.  *See id.* at *11–12.  The defendants had placed legal but senseless and unprofitable

trades, and they had done it for an improper purpose.  *See id.* at *12; *accord City Power*,

199 F. Supp. 2d at 224–25, 235–36 (reaching same conclusion about  same alleged trading

scheme).  It did not matter that the deceptive trading could have been legitimate if the defendants

had acted with an innocent purpose.  That was not what happened.  The trades were "sham

transactions" with "the outward form" of legitimacy "but none of the economic substance."

*City Power*, 199 F. Supp. 2d at 236; *see also Barclays I*, 105 F. Supp. 3d at 1146–47 (holding

facially legitimate power trades were manipulative when undertaken with intent to influence

value of financial product in parallel market).

FERC's manipulation claim, as pled, falls neatly within the foregoing precedent.  FERC

alleges Corteggiano and Vitol used unprofitable trades in the physical power markets to reduce

Vitol's exposure to CRR losses.  Compl. ¶ 2. FERC says these transactions may have been "real"

31

1    in the sense they involved willing buyers and sellers, but they were a sham at their core.  FERC

2    alleges specifically and plausibly that power prices, price differences and losses were irrelevant to

3    Corteggiano's strategy and that congestion prices were his only target.  For example, according to

4    the complaint, Vitol's traders cared little about the terms of the transactions they entered, offering

5    to accept a single megawatt and to sell their imports for as little as a dollar per megawatt hour.

6    Compl. ¶¶ 57–58.  Transactions lost money, but traders pushed ahead.  *See id.* ¶ 59.  When

7    Vitol's CRR losses were no longer uncovered, the unprofitable trades ceased.  *See id.* ¶ 60.  And

8    Corteggiano had never traded in physical power before, except when he had used the same cross-

9    market strategy to reduce CRR losses at Deutsche Bank.  *Id.* ¶ 63.

10        FERC's allegations also are particularized, as required by Rule 9(b).  FERC identifies

11    specific people, places, times, prices, and other details.  *See, e.g.*, Compl. ¶¶ 57–59; Penalty Order

12    ¶¶ 35–57.  It also alleges Vitol and Corteggiano acted with an improper intent to avoid losses in a

13    different market and illustrates that allegation with specific factual allegations about the two

14    defendants' goals.  *See* Compl. ¶¶ 46–51, 66–73, 79.

15        Vitol and Corteggiano have not distinguished this case from *Coaltrain*, *City Power*, and

16    *Barclays I*.  Vitol does not cite *Coaltrain*, and its discussions of *Barclays I* and *City Power* do not

17    address the core holding discussed above, that FPA section 222 "proscribes deception not only in

18    the form of misleading statements but also in the form of misleading [c]onduct itself . . . "

19    *Coaltrain*, 2018 WL 7892222, at *12 (alteration in original).  *See* Vitol Mot. at 22 n.12, 13–14,

20    22, 27.  Corteggiano argues only briefly that this case is distinguishable from *Coaltrain* and *City*

21    *Power* because it includes no allegations of "wholly uneconomic" bids or offers or similar

22    manipulative conduct.  *See* Corteggiano Mot. at 14.  As summarized above, however, FERC does

23    allege Corteggiano and Vitol both were indifferent to the profits or losses they would make

24    importing power over the Cascade intertie.  *See* Compl. ¶¶ 57–59.  Nor do Vitol and Corteggiano

25    support their generic assertions that FERC's complaint falls short of Rule 9(b).  *See* Vitol Mot. at

26    26–27; Corteggiano Mot. at 1, 5–6, 10; Vitol Reply at 15.

27        Vitol and Corteggiano focus instead on other points.  They contend their actions were not

28    deceptive because they did not misrepresent any facts, disclose false information, withhold any

information in the face of a duty to disclose, or impair any markets. Vitol Mot. at 31–34; Vitol Reply at 11–13; Corteggiano Mot. at 11–13.  Their trades, they say, actually corrected an "artificial" or "phantom" price that was the result of an algorithm rather than economic forces. *See, e.g.*, Vitol Mot. at 30–31; Vitol Reply at 12; Corteggiano Mot. at 12.  Given FERC's allegations, the court cannot at this stage determine that Corteggiano's and Vitol's trading actually drove power prices toward any competitive economic equilibrium.

Vitol's and Corteggiano's arguments also depend on the implicit premise that the "true" or "correct" prices for their transactions were not those set by the CAISO algorithm.  Perhaps CAISO could have devised a better pricing system for partially derated, low-volume nodes.  Perhaps not.  But at this stage, the court must draw inferences in FERC's favor based on the pleadings.  Given FERC's allegations, the court must infer the "true" or "correct" price is the value determined by CAISO's algorithm, however counterintuitive that price might have been. *See* Compl. ¶¶ 19, 25–27, 46–60.

With this inference, FERC's allegations make out a plausible claim of manipulation. According to FERC's complaint, defendants' scheme was not intended to reveal information or restore prices to a demand-meets-supply equilibrium.  It was not even a plan to make money by trading power; Vitol's and Corteggiano's only goal was to avoid losses in another market.  If it were viable, the defendants' argument would justify every cross-market scheme and preclude litigation of a claim.  For example, a trader could buy and sell in market A at whatever price and quantity it took to make money in market B, then avoid liability by arguing the true "market prices" were those that maximized its returns in market B.

Next, Vitol and Corteggiano argue FERC cannot succeed on this claim because FERC has not alleged they "controlled or artificially affected the price of power at Cragview."  Vitol Mot. at 28 (quotation marks, alterations, and emphasis omitted); *see also* Corteggiano Mot. at 16, 21. They derive this argument from a passage in the Supreme Court's decisions in *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976), and *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462 (1977), as well as later decisions among the lower courts on the scope of section 10(b) and Rule 10b-5. *See, e.g.*, *Silkman I*, 177 F. Supp. 3d at 706–07; *Coaltrain*, 2018 WL 7892222, at *4;

1   *Barclays I*, 105 F. Supp. 3d at 1147.  The first problem with this argument is that it contradicts

2   FERC's complaint.  FERC alleges market prices changed as a result of Vitol's and Corteggiano's

3   trading.  *See* Compl. ¶¶ 58–59.  The defendants' argument also reads too much into the Supreme

4   Court's decisions in particular.  Some context helps to explain why.

5        In *Ernst & Ernst*, the president and majority owner of a small brokerage firm had tricked

6   some of the firm's customers into investing in what he described as "escrow" accounts.  425 U.S.

7   at 189.  He was instead simply spending their money.  *See id.*  After the fraud came to light, the

8   investors sued the firm's accountants under section 10(b) and Rule 10b-5, alleging the

9   accountants should have discovered and revealed the fraud.  *See id.* at 189–90.  The Supreme

10  Court granted certiorari to decide "whether a private cause of action will lie under [section 10(b)

11  and Rule 10b-5] in the absence of any allegation of 'scienter' intent to deceive manipulate, or

12  defraud."  *Id.* at 193.  Several lower courts had reached conflicting decisions, with some

13  permitting 10(b) cases to proceed on what amounted to allegations of mere negligence.  *See id.*

14  at 193 n.12.

15       The Court decided section 10(b) "was intended to proscribe knowing or intentional

16  misconduct," *id.* at 197, not "negligent conduct alone," *id.* at 201.  In reaching this conclusion, the

17  Court responded to an argument the Securities and Exchange Commission had offered in an

18  amicus curiae brief: that "nothing in the language 'manipulative or deceptive device or

19  contrivance' limits [section 10(b)'s] operation to knowing or intentional practices."  *Id.* at 197–98

20  (quoting 15 U.S.C. § 78j(b)).  In the Court's view, this argument was simply incorrect.  The

21  words "manipulative," "device," and "contrivance" left no doubt that Congress was describing

22  more than mere negligence.  *See id.* at 199.  In explaining this conclusion, the Court wrote the

23  passage on which Vitol and Corteggiano now rely:

24          Use of the word "manipulative" is especially significant.  It is and was virtually a
25          term of art when used in connection with securities markets.  It connotes intentional
26          or willful conduct designed to deceive or defraud investors by controlling or
27          artificially affecting the price of securities.

28  *Id.*

The Court's holding in *Santa Fe* is similar.  In that case, a 90 percent stakeholder had acquired the remaining 10 percent of the company's shares under Delaware's short-form merger statute.  *See* 430 U.S. at 465.  That statute did not require consent from or advance notice to the minority shareholders, and they had received none.  *See id.* at 465–66.  The Second Circuit held the plaintiffs could proceed because they had alleged the majority shareholders had breached fiduciary duties.  *See id.* at 469–70.  Section 10(b), in the circuit's view, did not require allegations of deception or manipulation.  *See id.*  The Supreme Court took the case to decide whether this was so.  *See id.* at 471.  It reversed and held that manipulation or deception is a necessary element of any claim under section 10(b).  *See id.* at 471, 473–74.  Among other arguments, the Court rejected the minority shareholders' contention that breaches of fiduciary duty might be "manipulative."  *See id.* at 476–77.  To explain why, the Court quoted its observation in *Ernst & Ernst* that "manipulation" was "virtually a term of art in connection with securities markets" and did not always encompass every breach of a fiduciary duty.  *Id.* at 476–77 (quoting 425 U.S. at 199); *see also Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931 (9th Cir. 2009).

In short, *Ernst & Ernst* and *Santa Fe* impose two straightforward requirements on private plaintiffs who assert claims under section 10(b): the defendant's conduct must be (1) knowing or intentional and (2) manipulative or deceptive.  In neither case did the Court consider whether a "device" or "contrivance" might be "deceptive" or "manipulative" and thus violate section 10(b) even if it does not control or affect the price of a security.  As summarized above, lower courts have held that even lawful trading might be "manipulative" or "deceptive," and courts have not demanded that public sector plaintiffs prove a manipulative or deceptive scheme affected markets.  *See, e.g.*, *Koch*, 793 F.3d at 155 (declining to require "market impact"); *GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189, 206 (3d Cir. 2001) ("[P]roof of price movement is not necessary to establish a violation of Section 10(b) and Rule 10b–5 . . . ."); *Chemetron Corp. v. Bus. Funds, Inc.*, 718 F.2d 725, 728 (5th Cir. 1983) ("[T]he 10(b) claim is not defeated by the fact that the jury found the activities did not have an 'affect' on Chemetron's purchase price of the stock . . . ."); *Barclays I*, 105 F. Supp. 3d at 1147 (holding similarly after reviewing *Santa Fe* and

1    other authorities).  The Ninth Circuit's decision in *Desai* is not to the contrary.  In that case, the

2    Circuit simply summarized case law on the scope of private section 10(b) actions and held that

3    courts have "generally categorized deceptive and manipulative devices into misrepresentations,

4    omissions by those with a duty to disclose, or manipulative acts."  573 F.3d at 938.  It did not

5    hold that lawful trading can never violate section 10(b) or that a plaintiff must prove the

6    defendant controlled or artificially affected prices, and it did not address a regulator's

7    enforcement action.

8          The argument Vitol and Corteggiano make also depends on two implicit and doubtful

9    premises: (1) that "manipulative" is a "term of art" in markets for wholesale electrical power just

10   as it is a term of art in securities markets and (2) that the word has the same definition in those

11   markets.  *See, e.g.*, Vitol Mot. at 35; Vitol Reply at 17; Corteggiano Mot. at 23.  Electrical power

12   markets are unlike many others, for example because as noted above electricity must usually be

13   produced at almost exactly the moment it is consumed, regardless of price.  Vitol and

14   Corteggiano have not described any parallels between the unusual characteristics of the products

15   traded on CAISO's markets, such as CAISO's algorithmic prices and the determinants of those

16   prices, and the products traded on securities markets.  Also, Congress expressly delegated FERC

17   authority to decide what is "deceptive" and "manipulative" in the markets under its jurisdiction,

18   *see* 16 U.S.C. § 824v(a), and FERC has determined that cross-market schemes like the one

19   alleged here violate the FPA, s*ee* Compl. ¶ 10.  Vitol and Corteggiano have not explained why the

20   regulations here, or FERC's interpretation of those regulations, are unreasonable or wrong.  At

21   this stage of the case, the court sees no reason to preclude FERC from proceeding on its claim.

22   *See, e.g.*, *United States v. Haggar Apparel Co.*, 526 U.S. 380, 391 (1999) ("Deference can be

23   given to the regulations without impairing the authority of the court to make factual

24   determinations, and to apply those determinations to the law, de novo."); *Greene Cty. Plan. Bd. v.*

25   *Fed. Power Comm'n*, 559 F.2d 1227, 1239 (2d Cir. 1976) ("[The] interpretation of the Federal

26   Power Act by the agency charged with its administration is entitled to great deference from this

27   Court.").

1    In sum, given the early stage of this litigation, FERC's specific factual allegations, the

2    broad language in the FPA's antimanipulation rules, and support in the case law interpreting

3    analogous provisions of the Securities Exchange Act, the court concludes the complaint states a

4    claim under the FPA's antimanipulation provision.

5          **D.     Vitol's Liability as Employer and Principal**

6    Vitol argues that even if the complaint states a claim for manipulation based on

7    Corteggiano's intentions, it does not allege that other people at the firm shared his knowledge or

8    intent. *See* Vitol Mot. at 34–35; Vitol Reply at 17–19. Vitol cites FERC's allegations about

9    Corteggiano's attempts to withhold the truth from legal and compliance personnel. *See, e.g.*,

10   Vitol Mot. at 35. In response, FERC argues Corteggiano was acting as Vitol's agent, so his intent

11   is imputed to Vitol. *See* Opp'n at 36–37. FERC does not cite any provision of the FPA under

12   which an agent's mental state can be imputed to its principal. Instead, it relies on case law

13   interpreting section 10(b) and Rule 10b-5. *See id.* For the same reasons discussed above, the

14   court agrees that analogy is reasonable given the FPA's express reference to section 10(b) in

15   defining the phrase "manipulative or deceptive device or contrivance." *Cf. In re ChinaCast Educ.*

16   *Corp. Sec. Litig.*, 809 F.3d 471, 478 (9th Cir. 2015) (applying agency principles from antitrust

17   case law in securities action because reasoning of that case law "not limited to [the antitrust]

18   context").

19   Like the FPA, "the Securities Exchange Act and accompanying regulations do not contain

20   any explicit instructions on when an employee's acts and intent are to be imputed as those of the

21   company." *In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d at 475. The Ninth Circuit has

22   nevertheless held that employers can be liable for their employees' actions under principles of

23   agency law. *See Hollinger v. Titan Cap. Corp.*, 914 F.2d 1564, 1577 (9th Cir. 1990) (en banc).

24   Otherwise, a firm could "avoid secondary liability simply by showing ignorance, purposeful or

25   negligent, of the acts of its registered representative." *Id.* (quoting *Paul F. Newton & Co. v.*

26   *Texas Com. Bank*, 630 F.2d 1111, 1118 (5th Cir. 1980)). That result would "contravene[]

27   Congress' intent to protect the public, particularly unsophisticated investors, from fraudulent

28   practices." *Id.* (quoting *Newton*, 630 F.2d at 1118).

1    The Ninth Circuit has thus adopted "the general rule of imputation" in cases of alleged

2    fraud under section 10(b).  *See ChinaCast*, 809 F.3d at 476.  Under that rule, an employer can be

3    liable for an employee's "fraud committed 'within the scope of his employment' or 'for a

4    misleading statement made by an employee or other agent who has actual or apparent authority.'"

5    *Id.* (quoting *Hollinger*, 914 F.2d at 1577 n.28).  But a "rogue agent's actions or knowledge are

6    'not imputed to the principle if the agent acts adversely to the principle in a transaction or matter,

7    intending to act solely for the agent's own purposes or those of another person.'"  *Id.* (quoting

8    Restatement (Third) of Agency § 5.04 (2006)).  The rogue agent exception is known as the

9    adverse interest exception.  *See id.*

10    Here, as pled, Corteggiano's allegedly manipulative and deceptive actions and purposes

11    can be imputed to Vitol under these principles.  Corteggiano was acting within the scope of his

12    employment when he devised and executed the alleged scheme to manipulate prices in the

13    physical power market.  Although physical power transmission was normally not his

14    responsibility, he obtained Vitol's authorization.  *See* Compl. ¶¶ 53–56.  He was not acting solely

15    for his own purposes or to benefit some third party, so this is not a case for the adverse interest

16    exception.  According to the complaint, Corteggiano's intent was to reduce Vitol's CRR

17    exposure.  *See, e.g.*, *id.* ¶ 51.

18    This conclusion withstands Vitol's arguments that Corteggiano did not truly "act."  *See*

19    Vitol Reply at 18.  FERC alleges Corteggiano devised the alleged scheme, obtained Vitol's

20    authorization to move forward with his plan, and instructed others what trades to make.  *See*

21    Compl. ¶¶ 56–57.  *Staub v. Proctor Hospital*, which Vitol cites, is not to the contrary.  *See* Vitol

22    Reply at 18 (citing 562 U.S. 411 (2011)).  In *Staub*, the Supreme Court expressly declined to

23    decide "what the background rule of agency law may be."  562 U.S. at 418.  And in any event,

24    FERC alleges both wrongful intent and wrongful actions by the same employee, Corteggiano, so

25    the question that went unresolved in *Staub* is irrelevant.  *Cf. id.* (describing conflict about whether

26    one agent's malicious intent can combine with another agent's malicious actions to impose

27    liability on their shared principal).

1    Nor may Vitol avoid liability by arguing Corteggiano withheld information from Vitol's

2    legal and compliance team. *See* Vitol Reply at 18. Such a holding would flout the Ninth

3    Circuit's decision that principals cannot "avoid secondary liability simply by showing ignorance,

4    purposeful or negligent," of what their agents have done. *Hollinger*, 914 F.2d at 1577 (quoting

5    *Newton*, 630 F.2d at 1118). As explained above, FERC's allegations foreclose Vitol's successful

6    reliance on the "adverse interest" exception, at least at this stage.

7         **E.    Corteggiano as Primary Violator**

8    Corteggiano contends similarly that others are actually responsible for the allegedly

9    fraudulent scheme. He points out he did not personally perform the allegedly wrongful trades and

10   that Vitol approved the trades ahead of time. *See* Corteggiano Mot. at 6–10. As a result, he

11   contends, he was not the "primary violator," but rather only an aider or abettor, and so cannot be

12   liable for the primary role. *See id.* at 6–7.

13   Corteggiano's argument in this respect again draws on case law interpreting section 10(b)

14   and Rule 10b-5. The Supreme Court has held these provisions do not impose liability on those

15   who aid and abet securities fraud, known as secondary violators, but rather only on those who

16   themselves commit frauds, the primary violators. *See Cent. Bank of Denver, N.A. v. First*

17   *Interstate Bank of Denver, N.A.*, 511 U.S. 164, 177 (1994); *see also, e.g.*, *Janus Capital Group,*

18   *Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011) (holding "maker of a statement is the

19   person or entity with ultimate authority over the statement, including its content and whether and

20   how to communicate it"). In response to the Court's decision in *Central Bank*, Congress

21   amended the securities laws to permit the government, but not private parties, to pursue claims for

22   aiding and abetting securities frauds. *See Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*,

23   552 U.S. 148, 158 (2008) (citing 15 U.S.C. § 78t(e)). Congress did not amend the FPA similarly.

24   Federal courts expressly relying on the lack of amendment have interpreted the FPA as restricting

25   liability to those who themselves violate its antimanipulation rules, and not extending to those

26   who aid and abet. *See Coaltrain*, 2018 WL 7892222, at *17–20; *Silkman I*, 177 F. Supp. 3d at

27   707–08.

39

1       Assuming without deciding that secondary violators are not liable under the FPA, the

2  decisions referenced above do not show the claims against Corteggiano must be dismissed.

3  FERC alleges Corteggiano conceived of the alleged scheme, proposed transactions to Vitol's

4  legal and compliance teams, secured their approval, and gave instructions to others at the

5  company, who executed the trades FERC now claims were manipulative and deceptive. *See*

6  Compl. ¶¶ 51–59. If these allegations are not read as saying Corteggiano was a primary violator,

7  then there would be a violation but no primary violator, only aiders and abettors. Imposing

8  liability on Corteggiano also is consistent with the Supreme Court's later interpretation of its

9  decisions in *Central Bank* and *Janus Capital Group*. *See Lorenzo v. S.E.C.*, 139 S. Ct. 1094,

10  1100–01, 1103–04 (2019) (holding person who disseminated false statement in his own name was

11  primary violator even though he had not composed false statement, distinguishing *Janus* and

12  *Central Bank*).

13       **F.**    **Fair Notice**

14       Corteggiano also argues FERC gave him no fair notice that his trades would violate the

15  FPA. *See* Corteggiano Mot. at 1–15. His argument rests on the general constitutional rule that

16  requires the government to "give the person of ordinary intelligence a reasonable opportunity to

17  know what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford*,

18  408 U.S. 104, 108 (1972). This rule applies to regulations. *See F.C.C. v. Fox Television Stations,*

19  *Inc.*, 567 U.S. 239, 253 (2012). "[I]n the absence of notice—for example, where the regulation is

20  not sufficiently clear to warn a party about what is expected of it—an agency may not deprive a

21  party of property by imposing civil or criminal liability." *United States v. Approximately 64,695*

22  *Pounds of Shark Fins*, 520 F.3d 976, 980 (9th Cir. 2008) (quoting *Trinity Broadcasting of*

23  *Florida, Inc. v. Fed. Commc'n Comm'n*, 211 F.3d 618, 628 (D.C. Cir. 2000)).

24       FERC's allegations permit the court to infer that Corteggiano had notice that his trading

25  strategy violated the FPA: (1) Corteggiano had used a similar cross-market trading strategy in the

26  past, and FERC had pursued an enforcement action alleging the strategy violated the FPA,

27  Compl. ¶ 27; (2) CAISO publicized the risk of this type of "manipulation," *id.* ¶ 26; (3) when

28  Corteggiano implemented his strategy at Vitol, he attempted to conceal his purpose from Vitol's

1    legal and compliance personnel, who were aware of his prior involvement in the Deutsche Bank

2    matter, *id.* ¶¶ 53–55; Penalty Order ¶ 53 n.157; (4) at least one other company suspected

3    Corteggiano and Vitol were using an illegal scheme, *see* Staff Report at 17–18, Req. J. Not. Ex. E

4    at 27–28; and (5) Corteggiano turned to the cross-market strategy only after others failed, *see*

5    Compl. ¶¶ 46–51, which suggests he understood it posed legal risks.  Federal courts have rejected

6    similar challenges to claims in a civil complaint resting on the FPA's antimanipulation provisions

7    and FERC's antimanipulation rule in cases based on similar allegations.  *See Coaltrain*, 2018 WL

8    7892222, at *15; *City Power*, 199 F. Supp. 3d at 238–39; *Silkman I*, 177 F. Supp. 3d at 702–06.

9           **G.      Increasing the Penalty Against Corteggiano**

10          Lastly, Corteggiano argues FERC acted outside its statutory authority by assessing a

11   penalty against him, of $1,000,000, which was larger than the $800,000 penalty it originally

12   proposed in the order to show cause initiating the regulatory process.  *See* Compl. ¶¶ 2, 35;

13   Corteggiano Mot. at 15–17.  The FPA supports this position.  Before "assessing a civil penalty,"

14   FERC must "provide . . . notice of *the* proposed penalty."  16 U.S.C. § 823b(d)(1) (emphasis

15   added).  Then, if the alleged violator elects the default option, FERC "shall assess *the* penalty"

16   after holding an administrative hearing.  *Id.* § 823b(2)(A) (emphasis added).  "In the case of any

17   civil penalty with respect to which" the alleged violator elects the alternate option, FERC "shall

18   promptly assess *such* penalty, by order, after the date of the receipt of the notice . . . of *the*

19   proposed penalty."  *Id.* § 823b(d)(3)(A) (emphasis added).  By referring consistently to a singular

20   "penalty," by using the definite article, and by referring to "such penalty," Congress made clear it

21   was consistently referring to the same penalty—the proposed penalty—and intended the assessed

22   penalty to be no greater than the proposed penalty.

23          This interpretation reinforces the purposes of the notice required by § 823b(d)(1): putting

24   "a party on notice of the charges against which it must defend and the penalties that it might

25   incur."  *Clifton Power Corp. v. F.E.R.C.*, 88 F.3d 1258, 1268 (D.C. Cir. 1996).  If FERC could

26   assess a larger penalty than it proposed, then the notice would not serve this purpose.  The D.C.

27   Circuit has thus taken for granted that a "proposed penalty" is "the maximum penalty [FERC]

28   may impose."  *Id.*

1       The possibility for appellate or de novo review does not eliminate the harm that would

2  result if FERC could impose larger penalties than it originally proposes, especially when, as here,

3  the increase does not appear to rest on any new or different facts or allegations. *See Clifton*

4  *Power Corp.*, 294 F.3d at 113 ("[FERC] must calculate any penalty according to the statutory

5  factors set out in 16 U.S.C. § 823b(c)"). Nor does FERC's express authority to "compromise,

6  modify, or remit" a penalty mean it can increase a penalty. *See* 16 U.S.C. § 823b(d)(4). The

7  context of that language shows it was intended as a safety valve for settlement negotiations and to

8  recognize an alleged violator's "efforts . . . to remedy the violation in a timely manner." *Id.*

9  Otherwise, FERC could bypass the notice procedures required by § 823b(d) and unilaterally

10  increase penalties after assessing them. FERC's proposed approach does not lead to a reasonable

11  result. *See American Tobacco Co. v. Patterson,* 456 U.S. 63, 71 (1982) ("[s]tatutes should be

12  interpreted to avoid . . . unreasonable results whenever possible.").

13       Applying the statute faithfully here does not hamstring FERC's efforts to impose

14  appropriate penalties. FERC must take account of how serious a suspected violation is and what

15  the suspected violator has done to remedy that violation before proposing a penalty. 16 U.S.C.

16  § 823b(d)(1) ("Before issuing an order assessing a civil penalty against any person under this

17  section, the Commission shall provide to such person notice of the proposed penalty.") If FERC

18  discovers new evidence suggesting a higher penalty is appropriate, it can seek to impose the

19  higher amount after giving further notice under § 823b(d)(1) by amending its complaint in federal

20  court. *See* 18 C.F.R. § 385.1510(c) ("The Commission's authority to compromise, modify or

21  remit a civil penalty may be exercised at any time prior to a final decision by . . . the United

22  States District Court.").

23       The record here suggests that in practice, FERC obtains most of the information it relies

24  on before it proposes a penalty, subject to following defined procedures before imposing an

25  assessment. *See, e.g.*, Penalty Order ¶¶ 10–20; 16 U.S.C. § 825o-1(b) (civil penalties "shall be

26  assessed by the Commission, after notice and opportunity for public hearing"). When alleged

27  violators, as here, choose the alternate option, which bypasses an administrative hearing and

28  corresponding development of the record, there is little opportunity for FERC to identify bases for

1   increasing proposed penalties.  Ultimately, FERC's penalty assessment against Corteggiano is

2   based on its evaluation of the "seriousness of the violation" as well as "mitigating culpability

3   factors."  *See* Penalty Order ¶¶ 232–244.  FERC argues that if it must give a new notice before

4   increasing any proposed penalty, it could be trapped in a vicious cycle of new penalties and new

5   notices before proceeding to seek an appropriately higher amount.  *See* Opp'n at 41.  That danger

6   appears remote.  FERC cites only one other administrative case in which it assessed a greater

7   penalty than proposed.  *See id.* at 43 (citing *Lincoln Paper and Tissue, LLC*, 144 FERC ¶ 61,162

8   (2013) (assessing $5 million penalty after initially proposing $4.4 million penalty without

9   providing new notice)).  And as FERC acknowledges, it can compensate for evidentiary

10  uncertainties by seeking this court's de novo review of its penalty assessment.  *See id.* at 44

11  (citing *Preston v. Yeutter*, No. 95-35837, 1994 WL 447284, at *1 (9th Cir. Aug. 19, 1994)

12  (holding "[t]he de novo review conducted by the district court was sufficient to provide

13  [defendants] with an adequate hearing" despite alleged lack of notice before the agency)). For the

14  reasons discussed above, the court does not find FERC's arguments in this respect persuasive.

15  Corteggiano's motion will be granted to the extent it challenges the assessed penalty.

16  **IV.   CONCLUSION**

17        As explained above, defendants' requests for judicial notice are **granted in part**.  Vitol's

18  motion to dismiss is **denied.**  Corteggiano's motion to dismiss is **granted in part** to the extent the

19  court holds that FERC may not at this time pursue a greater penalty than the previously proposed

20  penalty of $800,000.  Corteggiano's motion is otherwise **denied**.  The motion to stay is **denied as**

21  **moot**.

22        The parties are directed to meet and confer and file a supplemental joint status report

23  **within fourteen days of this order,** proposing a schedule for discovery and dispositive motion

24  practice.

25        This order resolves ECF Nos. 30, 33, 31, 36, 54.

26        IT IS SO ORDERED.

27  DATED:  December 20, 2021.

CHIEF UNITED STATES DISTRICT JUDGE